**Barbara M. RYAN and William O. Gillespie, Plaintiffs–Appellants,**

v.

**ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES, et al., Defendants–Appellees.**

No. 97–2426.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 1, 1998.

Decided July 16, 1999.

Patricia C. Benassi (argued), Benassi & Benassi, Peoria, IL, for Plaintiffs–Appellants.

Jerald S. Post (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Defendants–Appellees.

Before COFFEY, KANNE, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

William Gillespie and Barbara Ryan served for many years in the Illinois Department of Children and Family Services ("DCFS"), rising ultimately to become Regional Administrator and Assistant Regional Administrator for the Springfield Region, respectively. DCFS has had its troubles over the years, and by the early 1990s some of those problems came to a head. Gillespie and Ryan lost their jobs, because, they claim, they were among the agency's critics. This led to the present lawsuit against DCFS itself and eleven individuals associated with it, in which they alleged that their rights under federal and state law had been violated when they were discharged. The district court granted judgment for the defendants before trial on all but one count, and at the close of the plaintiffs' evidence, it granted judgment as a matter of law for the defendants

on that one. We conclude that the court acted too hastily with respect to some of the issues, and we therefore remand the case for further proceedings.

## I

Ryan began her career at DCFS around 1964, and Gillespie joined the agency in 1981. They were responsible for the Springfield Division of DCFS, and in that capacity both were certified employees covered by the Illinois Personnel Code. This meant that they could be terminated only for cause. Prior to the events leading up to their terminations, both had excellent work records at DCFS and no record of disciplinary actions.

Gillespie and Ryan shared interests both on and off the job. In 1984, they established the Sand Dollar Publishing Company to publish Gillespie's poetry and books about reincarnation. Ryan shared those beliefs, which allegedly led to some of the problems inspiring this lawsuit.

Their claims focus on a series of incidents, the common theme of which was hostility on the part of DCFS higher-ups to the plaintiffs' frank criticism of the agency and to their unconventional personal beliefs. Before reviewing the specific bases for their claims, however, we offer a list of the different defendants and the role they played at DCFS:

1. DCFS itself, which is an agency of the State of Illinois.

2. Sue Suter: Director of DCFS from approximately January 1991 until after the events in question. She is no longer with the agency.

3. Thomas Villiger: Deputy Director for DCFS from approximately 1983 to mid–1991, now retired. He supervised Ryan and Gillespie.

4. Garry Veicht: Executive Deputy Director under Sue Suter, no longer with the agency.

5. Michael Horstman: Executive Deputy Director prior to Sue Suter's

appointment as Director, no longer with the agency.

6. Patrick Flynn: Child Protective Investigator, no longer employed by DCFS.

7. Michael Sakolsky: Adoption Worker (caseworker), still with DCFS.

8. Ronald Moody: Administrative Case Reviewer (caseworker), still with DCFS.

9. Rita Seggelke: Field Office Supervisor and child protective services investigator, no longer with the agency.

10. John Henderson: Labor Relations Administrator, still with DCFS.

11. Tom Putting: Chief of Personnel since July 1991, still with DCFS.

12. John Bucari: Administrator of Management Services, no longer employed by DCFS.

Each of these people, according to the plaintiffs, had some part to play in the following events, which led to their unhappy separation from the agency.

### A. Criticisms of DCFS

As DCFS insiders, the plaintiffs worked to correct the problems that they observed, through both internal communications and public criticisms. They regularly passed along concerns to their superiors at the agency, including Horstman and Villiger. They also contacted State Representative Michael Curran on numerous occasions, providing him with information about DCFS, including problems in the agency, alleged misuses of funds, and other alleged abuses. They complained to Horstman, Villiger, and Curran when DCFS decided to terminate the services of a certain psychologist in the Springfield Region. On one occasion, Ryan spoke with the *Chicago Tribune* about problems within DCFS. Their supervisors reacted hostilely to these communications.

### B. Child Welfare Initiative Project

In September 1989, Villiger assigned Ryan the task of drafting a new child welfare initiative, which was to identify problems within DCFS and appropriate solutions for them. She did so, with Gillespie's assistance. When she presented the completed work to Villiger, he ordered her to remove anything in the report that would reflect badly on his own supervision and to delete Gillespie's and her names. On the surface, she obeyed his order: the embarrassing material was excised from the version of the report that went to the then-director of DCFS, Gordon Johnson. The plaintiffs decided, however, to pass along an unedited version of the report to the Governor's liaison to DCFS.

### C. The Alleged "Baby Deal"

In December 1989, former DCFS client Linda Gerhardt informed Horstman that Flynn had improperly pressured her into giving up a child for adoption. Because this supposedly occurred within the Springfield Division, Johnson, Villiger, and Horstman asked the state police to investigate that office and Gerhardt's claims. No one informed Gillespie or Ryan that the police were conducting this work. In June 1991, Director Suter received a partial summary of the police investigation. Among the statements the police had collected was one from Flynn, who claimed that he had made the "baby deal" with Gerhardt at Ryan's direction—an assertion Ryan and Gillespie deny. The state's attorney declined to take action based on the report.

### D. Horstman and Villiger's Memoranda

In January 1991, Suter became the director of DCFS during a period in which DCFS and the Springfield Region in particular were the subject of negative media coverage. Shortly after she took office, she met with Curran, who related his concerns about the agency, mentioned that he had communicated in the past with Ryan and Gillespie, and asked for her permission to continue to do so. Suter did not object, but after Curran left she asked Villiger

and Horstman to brief her about the Springfield Region. The memoranda they sent to her in response to her request contained numerous false allegations and were so critical of Ryan and Gillespie that they recommended she remove both from their positions. Among other things, Villiger's memo accused Gillespie of causing the death of a child at school—an incident that mysteriously had not been mentioned negatively in his evaluation, perhaps because Villiger had at the time complimented Gillespie for his efforts in responding to the unfortunate situation. Horstman's memo mentioned Ryan's belief in reincarnation, and it accused her of improperly taking a child (whom she claimed to have known in another life) home with her for the weekend. Gillespie and Ryan were not told about the memos or otherwise informed of the criticisms against them.

E. Banishment to the Storage Room

One month into Suter's tenure and shortly after she received the damning memoranda, Villiger informed Ryan and Gillespie that they were being immediately removed from their Springfield positions and being placed on "special assignment" in the agency's central office, and that they had one day to clear their desks. "Special assignment" turned out to be a euphemism for exceptionally bad working conditions. Gillespie was assigned to a dirty storage room with no support staff and no telephone; Ryan had similar quarters and amenities. Furthermore, neither plaintiff was given any meaningful duties to perform. Within a month, they had both filed grievances (which were unsuccessful through the first hearing level) protesting their treatment, but Villiger, Henderson, Suter, Veicht, and Putting all claimed that the reassignment was not punitive at all, but instead was a special assignment due to their special skills.

After the plaintiffs' exile to the storage rooms, Suter ordered an investigation of the Springfield Division by DCFS internal auditors. In the meantime, the state police were also looking into roughly the same matters. Neither set of investigators found anything to substantiate any allegations of wrongdoing. After the state's attorney declined to prosecute, defendant Veicht ordered Henderson to review the state police report for allegations of misconduct against Ryan and Gillespie—and only those two. Acting upon these instructions, and disregarding standard DCFS termination procedures, Henderson recorded all negative information about them in the report, and he ignored all contradictory or exonerating information. While all this was going on, Suter, Villiger, Horstman, Veicht, Putting, and Henderson were making efforts to make the plaintiffs think that nothing was wrong. Villiger gave Gillespie a positive evaluation in July of 1991 and recommended that he receive a 4.5% raise. In September of 1991, defending against the plaintiffs' grievance over the reassignment, the DCFS officials insisted that there had been nothing derogatory or unfavorable about it.

Immediately thereafter, the chief legal counsel for DCFS contacted an outside lawyer and asked him to help prepare charges against the plaintiffs, as a first step toward their discharge. The lawyer met with several people from DCFS, including Henderson, to develop the formal statement. One of his associates, Attorney Della Nelson, then reviewed the charges for form only. She understood that the decision had already been made to terminate both plaintiffs, but she was concerned about the lack of evidence to support the charges.

In spite of those problems, DCFS went forward with the termination procedures. On December 20, 1991, Henderson sent Ryan and Gillespie a memo, informing them that their pre-termination hearing was scheduled for December 30, 1991, that they would be given a copy of the charges against them at that time, and that they could have counsel present. Plaintiffs' lawyer responded on December 23 with a

request for advance copies of the charges and underlying documentation and for a different date, because she could not attend on December 30. On December 27, she received the charges and some 300 pages of documents (but not some that plaintiffs believed would exonerate them), but DCFS refused to reschedule the hearing.

Neither Ryan nor Gillespie attended the December 30 hearing, not wishing to go without representation and without a meaningful opportunity to respond to the charges. Instead, seeing the handwriting on the wall, on December 31, 1991, Ryan followed through on her decision to retire, announced one month earlier when the pressures of the banishment to the storage room and the state police investigation finally became intolerable. She maintains that her retirement was a constructive discharge. On January 7, 1992, both filed written responses to the charges, which is permitted under the Illinois Personnel Code. 80 Ill. Adm.Code § 302.705. Suter suspended Gillespie on January 16, and terminated him effective January 23. Although Gillespie was entitled to a post-termination proceeding before the Illinois Civil Service Commission, he opted not to take that route, because he believed that the Commission was "political" and would not give him a fair hearing.

Ryan and Gillespie filed separate complaints (their cases were consolidated later) under 42 U.S.C. §§ 1983 and 1988, alleging that DCFS and the individual defendants had violated their rights under the First and Fourteenth Amendments of the U.S. Constitution, as well as under various Illinois state laws. They are not appealing the district court's disposition of two claims, which leaves the following five for our consideration: (1) discharge in retaliation for conduct and speech protected by the First Amendment; (2) denial of procedural and substantive due process rights; (3) denial of the right to equal protection; (4) violation of Illinois whistle

blower protection laws; and (5) defamation.

## II

### A. DCFS as Defendant

The district court began by dismissing all claims against DCFS itself, on the ground that as an agency of the State of Illinois it was entitled to immunity under the Eleventh Amendment. We agree. In the absence of a valid waiver of immunity or a statute overriding the state's immunity, see *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54–55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the state as such may not be sued in federal court. See also *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank,* ⸺ U.S. ⸺, 119 S.Ct. 2199, ⸺ L.Ed.2d ⸺ (1999); *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* ⸺ U.S. ⸺, 119 S.Ct. 2219, ⸺ L.Ed.2d ⸺ (1999). Here, there is no waiver, and it is well established that neither a state nor a state agency like DCFS is a "person" for purposes of § 1983, see *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), and thus that § 1983 does not trump the state's immunity. To avoid the sovereign immunity bar, the plaintiffs now seek to sue the current director of DCFS in his official capacity for prospective equitable relief under the doctrine of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Because the plaintiffs failed to raise this issue before the district court, it is waived. The remainder of our discussion addresses only plaintiffs' claims against the various individual defendants.

### B. First Amendment

In order to establish a First Amendment retaliation claim, a plaintiff must show that her speech was constitutionally protected under the circumstances, and that the defendants retaliated against her because of that speech. See *Button v. Kibby–Brown,* 146 F.3d 526, 529 (7th Cir. 1998); *Gorman v. Robinson,* 977 F.2d 350,

354 (7th Cir.1992). The district court found that the plaintiffs had alleged only four instances of speech that, viewed favorably to them, were sufficiently related to their terminations to satisfy the second part of this inquiry: (1) Ryan's communication with the *Chicago Tribune*, (2) Gillespie's communication with Representative Curran, (3) Gillespie's poetry, and (4) Ryan and Gillespie's belief in reincarnation. Henderson used each of these examples in developing the charges of misconduct against the two, and the poetry writing and religious beliefs were mentioned in the final charges used as a basis for the terminations. The court also found that individual defendants Flynn, Sakolsky, Moody, Seggelke, and Bucari were entitled to dismissal on these claims, because the evidence did not support plaintiffs' allegations of a conspiracy that included them, and they were not otherwise sufficiently involved in the termination decision. Although plaintiffs may not be happy with these conclusions, they have not challenged them on appeal (at least, not with the requisite specificity), and we take this much as established for purposes of the case.

The district court allowed the First Amendment claim against the remaining six defendants to go to trial, but it granted judgment as a matter of law for them for two basic reasons: qualified immunity based on the plaintiffs' status as policymakers, and an insufficient link between the discharges and the religious beliefs and poetry.

As we have noted before, the idea of a "policymaker exception" to the First Amendment rights of state employees comes from a blending of two lines of Supreme Court decisions: the line setting forth the free speech rights of public employees established by *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and the line of political patronage cases exemplified by *Elrod v.*

*Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), which held that policymakers may, under some circumstances, be discharged for their political beliefs. See *Wilbur v. Mahan*, 3 F.3d 214, 215 (7th Cir.1993). In two cases decided after the events at issue here, this court ruled that a government employer may fire a policymaking employee for "advocating positions in conflict with . . . stated policies." *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995); see also *Wilbur*, 3 F.3d at 217. It is true that both *Wilbur* and *Warzon* left the door open to a normal *Pickering/Connick* analysis for policymakers fired because of speech unrelated to the position they hold, which might apply to the poetry and reincarnation grounds.

█ But, apart from the merits and scope of an appropriate policymaker exception, we agree with the district court that it was not clearly established in 1991 and 1992 that a policymaker could *not* be fired for speaking out against agency policy. The Second Circuit came to the same conclusion in *McEvoy v. Spencer*, 124 F.3d 92, 103 (2d Cir.1997), and we find its analysis persuasive. This is enough to dispose of plaintiffs' claims based on the contacts with Representative Curran and the *Chicago Tribune*.

█ Although Ryan and Gillespie have also argued that they were not "policymakers" at DCFS, and thus that the defendants are not entitled to qualified immunity regardless of the state of this circuit's law on the policymaker exception, the undisputed facts demonstrate otherwise. To determine whether an employee is a policymaker, "[t]he test is whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Warzon*, 60 F.3d at 1239, quoting *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir.1981). The record demonstrates

that persons holding the jobs of Regional Administrator and Assistant Regional Administrator had this kind of meaningful input into DCFS decisionmaking. That the plaintiffs' views went ignored does not change the character of their positions. See *Warzon*, 60 F.3d at 1240.

Last, the plaintiffs argue that the district court (and by extension, this court) should not have considered the policymaker exception at all because the defendants raised it too late. The first time the defendants linked their qualified immunity argument to the policymaker exception was in a second, late-filed motion for summary judgment. The district court opted to treat the filing as a motion *in limine*, which it denied "because it contains essentially the same arguments as the Defendants' [original] summary judgment motion but with different labels." The court did, however, grant the defendants leave to refile their motion at the close of the evidence. They did so, and the court then granted it. We find no abuse of discretion in this aspect of the court's management of the case. Nor did the district court abuse its discretion when it limited the evidence plaintiffs could present about the nature of their duties.

Qualified immunity thus protects the defendants against allegations that they terminated the plaintiffs on account of their discussions with Representative Curran and the *Chicago Tribune* about the problems within DCFS. It is also one reason for rejecting their claims based on the poetry and religious beliefs. If there were an absolutely unqualified policymaker exception (which we reiterate would go beyond our existing decisions), the defendants would have been free to fire Ryan and Gillespie for any reason, including speech unrelated to their jobs. Even if there is not, the law was unclear enough in 1991 and 1992 to protect these defendants.

The district court also found that neither the poetry nor the religious beliefs were a substantial or a motivating factor behind the terminations. In one of the charges, the defendants alleged that Gillespie was writing his poetry while he was on the job, and that (regardless of whether this had been tolerated in the past or not) they did not want him to continue doing so. He does not dispute this; to the contrary, he argues only that DCFS formerly regarded his poetry as good enough to include in office manuals and conference materials. Director Suter was entitled to change the rules, and apparently she did so. As for Gillespie's reincarnation beliefs, nothing suggests this motivated his discharge. One charge against Ryan alluded to her beliefs, in which Ryan was accused of violating DCFS rules when she told the president of a foster parent's association that children are closer to God than adults because they have seen God more recently. The plaintiffs also point us to Horstman's memorandum to Suter stating that Ryan improperly took a foster child home overnight whom she claimed to have known in another life. We agree with the district court that the link between the beliefs and the constructive termination was too weak to support a decision in Ryan's favor. Regardless of her reasons for taking the child home with her, Ryan admitted at trial that such an overnight visit would have been a violation of DCFS rules. And she conceded that it would have been unprofessional to make such a statement to the association president. (She denied making the statement, but she cannot show that the defendants did not believe she said it.) Thus, even if one could say that it was clearly established in 1991 and 1992 that speech unrelated to the job was protected under *Pickering*, and if we considered the poetry and reincarnation beliefs to be unrelated, the district court's causation findings support its dismissal of these claims.

## C. Due Process

Even if the plaintiffs had a protected property interest in their jobs for purposes of due process, they can show nothing that would satisfy the demanding constitutional

standards for a violation of substantive due process rights. See *Schacht v. Wisc. Dept. of Corrections*, 175 F.3d 497, 502 (7th Cir. 1999); *Dunn v. Fairfield Community High School District No. 225*, 158 F.3d 962, 965 (7th Cir.1998). We therefore proceed immediately to their procedural due process arguments.

As was the case with the First Amendment claims, some narrowing of the group of defendants is appropriate. The only defendants against whom plaintiffs are asserting this claim are Suter, Veicht, Henderson, and Putting. Thus, on this independent ground, we agree with the district court's decision to grant summary judgment for Villiger, Horstman, Flynn, Sakolsky, Moody, Seggelke, and Bucari.

No one disputes that Gillespie and Ryan, as employees covered by the civil service protections of the Illinois Personnel Code, were entitled to a pre-discharge hearing. The Supreme Court outlined the scope of the procedural protections to which the Constitution entitles such employees in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). See also *Schacht*, 175 F.3d at 503; *Staples v. City of Milwaukee*, 142 F.3d 383, 385 (7th Cir.1998). The required hearing need only be "an initial check against mistaken decisions," and its essential requirements are "notice and an opportunity to respond." 470 U.S. at 545–46, 105 S.Ct. 1487. This case is complicated by several facts: first, Gillespie and Ryan chose not to attend the December 30 hearing; second, as permitted by Illinois law, 80 Ill. Adm.Code § 302.705(c), they did respond in writing; and third, they claim that the December 30 hearing itself was a sham because the decision to terminate them had long since been made.

▮▮▮▮ Ordinarily, when an employer offers a pretermination hearing and the employee fails to accept, the *Loudermill* right to such a hearing is waived. See *Flynn v. Sandahl*, 58 F.3d 283, 288 (7th Cir.1995); *Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis*, 42 F.3d 403, 414 (7th Cir.1994). Although the plaintiffs complain that DCFS did not give them adequate notice of the hearing, the record indicates that they received Henderson's December 20 letter the next day, which was still nine days before the hearing. Three days before the hearing, on December 27, they received the charges and a substantial amount of supporting material. Even if these were not generous time periods, they were enough to allow the plaintiffs to decide how best to proceed. See *Staples*, 142 F.3d at 384; see also *Wallace v. Tilley*, 41 F.3d 296, 300 (7th Cir.1994) (written notice received six days before a scheduled hearing is constitutionally sufficient); *Panozzo v. Rhoads*, 905 F.2d 135, 139 (7th Cir.1990) (written notice received the night before the hearing is constitutionally sufficient).

▮▮▮▮ The plaintiffs also claim that the notice was insufficient because it did not catalog all of the reasons for their termination. In particular, they point to Suter's testimony at trial that one of the reasons she terminated Ryan and Gillespie was because they had improperly given a DCFS employee priority in seeking to adopt a child. This allegation was not part of the formal charges against them. The plaintiffs' problem is that even if the notice did not include all of the reasons behind their firing, it did detail many charges that were used to terminate them. Had the plaintiffs been discharged only—or even primarily—for reasons not among the listed charges, we would be concerned about the adequacy of the notice. As it stands, however, we believe the plaintiffs received a sufficient explanation of why DCFS was firing them.

▮▮▮▮ Finally, the plaintiffs argue that their due process rights were violated by the defendants' failure to give them, prior to the preterminaton hearing, all relevant documentary support for the charges. At the pre-termination stage, however, the plaintiffs were entitled only to an "explanation of the employer's evidence," not a full

evidentiary hearing. *Loudermill,* 470 U.S. at 546, 105 S.Ct. 1487. The plaintiffs received a detailed list of charges as well as some 300 pages of documentation; this was enough. See *Panozzo,* 905 F.2d at 139.

■ The more difficult question is whether they waived their right to a live hearing when they failed to appear. Even though they did not attend the hearing in person, they both promptly responded to the charges in writing. Under the Personnel Code, an employee has five scheduled working days after receipt of the charges in which to respond, either orally or in writing, before she may be discharged. 80 Ill. Adm.Code § 302.705(c). In this case, both plaintiffs received the charges on December 27 and responded on January 7. The defendants have not argued that this was too late. On the surface, it therefore appears that plaintiffs chose to have their *Loudermill* hearing in writing and that there was nothing constitutionally inadequate about the pre-discharge procedures.

■ But a closer examination of plaintiffs' arguments reveals that they are not objecting in the abstract to the kind of procedures DCFS uses prior to terminating employees. The problem was deeper: any hearing at all in their particular case was meaningless, they assert, because the responsible DCFS officials had already decided to fire them and therefore the hearing would in reality be a phony opportunity to contest the charges. Due process requires that, prior to termination, an employee be given the chance to tell her side of the story, and that the agency be willing to listen. Otherwise, the "opportunity to respond" required by *Loudermill* is no opportunity at all. See *Levenstein v. Salafsky,* 164 F.3d 345, 352 (7th Cir.1998) (explaining "the commonsense notion that fundamentally biased process is not *due* process"); *Ciechon v. City of Chicago,* 686 F.2d 511, 517 (7th Cir.1982) ("Due Process requires that a hearing 'must be a real one, not a sham or a pretense.'") (quoting *Joint Anti–Fascist Refugee Committee v.*

*McGrath,* 341 U.S. 123, 164, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), quoting *Palko v. Connecticut,* 302 U.S. 319, 327, 58 S.Ct. 149, 82 L.Ed. 288 (1937)). That at the start of the hearing the agency decisionmakers tentatively believe the employee should be removed does not raise a constitutional problem—indeed, it would be surprising if the employee were brought up on charges warranting termination absent such a belief—so long as the decisionmakers are open to other views. Here, however, Ryan and Gillespie have alleged that the relevant DCFS officials were not so open.

■ A plaintiff who can introduce evidence that the decision has already been made and any hearing would be a sham is entitled to go forward with a procedural due process claim. *Levenstein,* 164 F.3d at 351–52; *Cliff,* 42 F.3d at 414. The district court thought that these plaintiffs did not satisfy that rule because they had not come forward with undisputed evidence that the decision had already been made. Instead, the facts were in dispute. In addition to the evidence showing that the responsible officials knew that the police and others had exonerated them and that their stated reasons were pretextual, the plaintiffs presented evidence that Nelson, the outside attorney responsible for reviewing the charges, believed that the decision to discharge had already been made. They also presented evidence that Eddie Price, who investigated the plaintiffs for DCFS but was not involved in the discharge decision, believed there was an effort to go after the plaintiffs and terminate them regardless of the evidence. The defendants testified to the contrary, and they argue that Price's testimony was irrelevant and lacking in foundation. Price had knowledge about the investigation, however, and plaintiffs' theory was that this was when the real decision was made. At this stage, we think the plaintiffs have scraped together enough to defeat the defendants' right to summary judgment. We therefore reverse the district court's judg-

ment in favor of defendants Suter, Henderson, Veicht, and Putting on the procedural due process claims and remand this part of the case for further proceedings.

## D. Equal Protection

 In late 1995, plaintiffs sought leave to amend their complaint to add an equal protection claim, on the theory that they had been the victims of selective prosecution. The defendants did not oppose the motion, and the district court gave them until January 11, 1996, to file their amendment. They failed to do so, but by the time the parties and the court got around to addressing the motions for summary judgment, everyone treated the equal protection claim as part of the case. In an October 25, 1996, order, the district court denied defendants' motion for summary judgment on that claim, holding that plaintiffs had succeeded in stating a claim for selective prosecution against defendants Suter, Veicht, Henderson, and Putting. (The court granted summary judgment for the defendants as to the others.) The equal protection claim was also incorporated in the final pretrial order of November 4, 1996.

That was enough to bring the claim into the case. Even before the November 4 pretrial order, the parties were proceeding on that claim by implied consent. See Fed.R.Civ.P. 15(b). The defendants left no doubt about their understanding of things when they filed their motion for summary judgment on the claim. Second, a final pretrial order "shall control the subsequent course of the action unless modified by a subsequent order." Fed. R.Civ.P. 16(e); see also *Vaughn v. King*, 167 F.3d 347, 352 (7th Cir.1999) ("Pretrial orders supersede the pleadings."); *Wilson v. Kelkhoff*, 86 F.3d 1438, 1442 (7th Cir. 1996). Thus, as of November 4, the equal protection claim was properly included in the case.

 The defendants then filed on November 13 a "Motion to Correct Record to Strike" the equal protection count from the October 25 summary judgment order. The district court allowed the motion under the authority of Rule 60(b)(1), which provides that "[o]n motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for ... mistake, inadvertence, surprise, or excusable neglect." Plaintiffs' earlier failure to file the amended complaint, the court thought, was fatal to their ability to pursue the claim, and on November 26 it struck the claim from the October 25 order. On December 9, the defendants moved to strike the equal protection claim from the final pretrial order under Rule 16(e), which allows for the modification of a pretrial order where necessary to "prevent manifest injustice." With the equal protection claim gone from the summary judgment order, the district court concluded that "it would prevent manifest injustice to strike the equal protection claim from the final pre-trial order because the equal protection claim is no longer an issue in the case." The court did just that on March 20, 1997.

 The problem with the district court's analysis is that by first striking the equal protection claim from the summary judgment order and then in a later ruling striking the claim from the pretrial order, the court did not adequately consider the defendants' December 9 motion to modify the pre-trial order in light of the stringent standards of Rule 16(e). In deciding whether to permit a modification of a pretrial order, the district court should consider points like (1) the prejudice or surprise to the nonmoving party, (2) the ability of the party to cure the prejudice, (3) the extent of the disruption to the orderly and efficient trial of the case or other cases in the court, and (4) the bad faith and willfulness in failing to comply with the court's order. *Smith v. Rowe*, 761 F.2d 360, 365 (7th Cir.1985); see also *Mankey v. Bennett*, 38 F.3d 353, 359 (7th Cir.1994); *Vukadinovich v. Zentz*, 995 F.2d 750, 754 (7th Cir.1993). Because the

court here looked at the case only as it appeared on December 9—with the equal protection claim already struck from the summary judgment order—it concluded that justice required it also to strike the claim from the pre-trial order.

The proceedings leading up to the December 9 motion must be viewed more broadly, however. Everyone had proceeded for months on the assumption that the claim was in the case; plaintiffs had no reason to believe that defendants would pounce on the lack of the earlier amendment, once defendants themselves had filed motions attacking the claim; its inclusion did not threaten the orderly process of the case; and the record shows nothing meeting the standard of "manifest injustice" required by Rule 16(e) in order to justify changing a final pre-trial order. Under the circumstances, the district court should not have struck the equal protection claim from the pretrial order. We therefore reverse the court's order dismissing the equal protection claim as to defendants Suter, Veicht, Henderson, and Putting and remand for further proceedings on that count also.

### E. Illinois Whistle Blower Protection Laws

■ Ryan and Gillespie also brought a number of state law claims, including a claim that their termination violated Illinois whistle blower protection laws. The district court granted summary judgment for the defendants because the statute that the plaintiffs cited in their complaint, the Illinois Whistleblower Protection Act, 5 ILCS 395/1, applies only to employees of constitutional officers, which the plaintiffs concede they are not. As the plaintiffs pointed out in their response to the defendants' motion for summary judgment, however, the Illinois Personnel Code contains its own whistle blower provision, 20 ILCS 415/19c.1, that does apply to them.

■ We have consistently held that plaintiffs are not required to plead legal theories. *B. Sanfield, Inc. v. Finlay Fine*

*Jewelry Corp.*, 168 F.3d 967, 973 (7th Cir. 1999); see also *Harrell v. Cook*, 169 F.3d 428, 432 (7th Cir.1999). While a plaintiff may plead facts that show she has no claim, *Jefferson v. Ambroz*, 90 F.3d 1291, 1296 (7th Cir.1996), she cannot plead herself out of court by citing to the wrong legal theory or failing to cite any theory at all. *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1134–35; *Sanfield*, 168 F.3d at 973. It is of no moment therefore that Ryan and Gillespie's complaint identified the wrong statute as the basis for their claim, as long as their allegations gave notice of a legally sufficient claim, see *Harrell*, 169 F.3d at 432, and they brought the legal support for their claim to the district court's attention in their response to the defendants' summary judgment motion, see *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir.1999). The defendants cannot—and do not—claim any sort of surprise: the complaint expressly alleges that the defendants retaliated against Ryan and Gillespie for their whistle blowing activities. Moreover, the plaintiffs responded to the defendants' summary judgment motion by pointing to the whistle blower provision found in the Illinois Personnel Code. We therefore remand the case to the district court for reconsideration of the evidence in light of 20 ILCS 415/19c.1. On remand, the district court may want to consider first whether this claim lies against all or merely some of the defendants.

### F. Defamation

■ The plaintiffs also brought state law claims for defamation, intentional infliction of emotional distress, and negligent infliction of emotional distress. Because the district court had granted summary judgment on all federal claims for defendants Flynn, Sakolsky, Moody, Seggelke, and Bucari, it used 28 U.S.C. § 1367(c) to decline supplemental jurisdiction over the state law claims against these five defendants. The court then addressed the merits of the state law claims as to Suter,

Henderson, Veicht, Putting, Horstman, and Villiger and found for the defendants.

On appeal, the plaintiffs challenge only one aspect of the district court's rulings: the decision to deny supplemental jurisdiction over the defamation claim as to defendants Flynn, Sakolsky, Moody, Seggelke, and Bucari. Although we have reversed the district court's grant of summary judgment on the due process and equal protection claims, those claims lie only against Suter, Veicht, Henderson, and Putting. Because there are no surviving federal claims against the remaining defendants, the district court acted within its discretion when it dismissed without prejudice the defamation claim against Flynn, Sakolsky, Moody, Seggelke, and Bucari. See *Centres, Inc. v. Town of Brookfield, Wisc.*, 148 F.3d 699, 704 (7th Cir.1998); *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 727 (7th Cir.1998).

### III

In conclusion, we AFFIRM the district court's grant of judgment as a matter of law on the First Amendment claim against all defendants. We REVERSE the court's decision to grant summary judgment on the due process and equal protection claims as to defendants Suter, Veicht, Henderson, and Putting, and REMAND for reconsideration of these claims as to these defendants only. We also REVERSE and REMAND the grant of summary judgment on the whistle blower claim. Finally, we AFFIRM the denial of supplemental jurisdiction on the state law defamation claim as to defendants Flynn, Sakolsky, Moody, Seggelke, and Bucari. Each party shall bear its own costs on appeal.