In the

# United States Court of Appeals
### For the Seventh Circuit

No. 05-2862

STELLA C. BATAGIANNIS,

*Plaintiff-Appellant*,

*v.*

WEST LAFAYETTE COMMUNITY
SCHOOL CORPORATION, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 4:04-cv-0035-AS—**Allen Sharp**, *Judge*.

ARGUED APRIL 7, 2006—DECIDED JULY 24, 2006

Before FLAUM, *Chief Judge*, and POSNER and
EASTERBROOK, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. West Lafayette, Indiana,
hired Stella Batagiannis in 1999 as Superintendent of the
school district. In 2002 the board of education (as we
call the governing body) gave Batagiannis a new contract
running until June 30, 2007. In May 2003, with more
than four years to go on that deal, the board suspended
Batagiannis (with pay) after losing confidence in her
leadership. She responded with a suit in state court,
maintaining that the suspension was a *de facto* discharge;
the state court declined to enjoin the board's proceedings or
undo the suspension. After a hearing in April 2004 the

board converted *de facto* to *de jure* and fired Batagiannis. This federal suit under 42 U.S.C. §1983 maintains that these steps violated Batagiannis's rights under the due process clause of the fourteenth amendment; she also contends that the board unlawfully retaliated against her for filing the state-court suit.

The district court granted summary judgment for the defendants (the school board and its trustees) after concluding that the April 2004 hearing provided Batagiannis with all requisite process. Logically the initial question on appeal should be whether *any* process was due. Batagiannis had a term contract, which creates a property interest. See *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985); *Board of Regents v. Roth*, 408 U.S. 564 (1972). But the Supreme Court's opinions on the subject of hearings when state actors propose to terminate a property interest in employment all concern line employees. Batagiannis, by contrast, was a policymaker, the head of a school district and wielder of considerable discretionary authority. Such a person may well have a property interest in the office's emoluments but not in the office itself—yet it is restoration to the position of Superintendent, and not just money, that Batagiannis seeks in this litigation.

The due process clause secures private interests against public deprivation. Governmental powers are not themselves private property. They do not exist independently of the government and are not secured against governmental interference. They are aspects of government, integral to it rather than claims against it. An attribute of a state's sovereignty can't sensibly be secured in private hands against governmental deprivation. Cf. *Stone v. Mississippi*, 101 U.S. 814, 820 (1880) ("[T]he power of governing is a trust committed by the people to the government, no part of which can be bargained away. . . . The contracts which the Constitution protects are those that relate to property rights, not governmental."). Every

appellate decision that has addressed the subject accordingly has held that a contractual right to be a superintendent of schools creates a property interest in the salary of that office but not the ability to make decisions on behalf of the public. See *Royster v. Board of Trustees*, 774 F.2d 618 (4th Cir. 1985); *Kinsey v. Salado Independent School District*, 950 F.2d 988 (5th Cir. 1992) (en banc); *Holloway v. Reeves*, 277 F.3d 1035 (8th Cir. 2002); *Harris v. Board of Education*, 105 F.3d 591, 596-97 (11th Cir. 1997) (dictum; appeal was resolved on immunity grounds). A superintendent of schools is in this respect like a football coach or a corporate CEO: the office may be withdrawn if the agreed compensation is paid. *Jett v. Dallas Independent School District*, 798 F.2d 748 (5th Cir. 1986). Cf. *Wiener v. United States*, 357 U.S. 349 (1958) (a federal official fired before a set term is up is entitled to be paid for the remainder of the term); *Richardson v. Sugg*, 448 F.3d 1046 (8th Cir. 2006) (same for basketball coach).

Defendants do not rely on this line of decisions, however, perhaps because they want to cut off Batagiannis's salary as well as her tenure of office. Nor do they contend that litigation in state court provides the process due for any error (whether substantive or procedural) they may have made. See *Chicago United Industries, Ltd. v. Chicago*, 445 F.3d 940, 944-45 (7th Cir. 2006); *Mid-American Waste Systems, Inc. v. Gary*, 49 F.3d 286, 291-92 (7th Cir. 1995). We therefore approach the appeal as the parties themselves have done—by assuming that the due process clause entitled Batagiannis to some kind of hearing—without examining whether that assumption is justified. Litigants in a future case may choose to explore the questions that these parties bypassed.

Batagiannis maintains that the hearing she received in 2004 is deficient because the school board's members made up their minds in 2002 or 2003 to get rid of her; all had prejudged the issue, and the hearing was a sham, by

her lights. In this respect, however, Batagiannis received exactly what she had agreed to accept: a hearing *by the school board*. That's what ¶5.b of her contract specified; by signing, she waived any entitlement to a wholly neutral decision-maker. Although *Arnett v. Kennedy*, 416 U.S. 134 (1974), rejected Justice Rehnquist's argument that government can avoid hearings by enacting a statute dispensing with them, the Court has never doubted the ability of individual employees to waive entitlements or negotiate in advance the details of the hearings they will receive. That's the premise of arbitration agreements, which surrender access to the courts in exchange for benefits that employees value more (such as higher salaries or faster decisions). See *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) (enforcing employee's agreement to arbitrate).

It is understandable that the board wanted to retain the authority to make the decision. Members are elected to set policy. They chose to delegate most decisions to a superintendent but are entitled (and doubtless expected by their constituents) to monitor the schools' administration and replace anyone not meeting their standards, see Ind. Code §20-26-5-4(8)(A)—whether or not the differences of opinion amount to "cause" for the superintendent's discharge. Accepting Batagiannis's position in this appeal would cripple the democratic process. Suppose the incumbents on the board supported the superintendent they had installed and their opponents stood for election on a platform of hiring a new superintendent to carry out different policies. According to Batagiannis's argument, however, as soon as the challengers were elected they would be disabled from replacing the superintendent, for they would have prejudged the issue.

Indeed, outgoing members of the board could vitiate the election by giving their appointee a term of office long enough to outlast the new members. Batagiannis herself had a five-year contract, exceeding the four-year term to

which board members are elected. (This board has experienced rapid turnover; only two of the seven trustees serving in 2004, when Batagiannis was fired, remain in office. See http://www.wl.k12.in.us/co/board/board.htm (listing the board's current members).) A long contract, plus a rule against participation in the decision by anyone who already had an opinion, would block the populace from using elections to change the way their schools are run. The due process clause does not prevent the creation of new policy; and when policy is carried out through appointees, the requirement of an opportunity for a hearing must be implemented in a way that allows the politically responsible office-holders to achieve their aims.

In saying this, we are well aware that administrative decision-makers, like judges, must be unbiased (though the definition of bias may differ, and judges are subject to extra rules that curtail the appearance of impropriety). See, e.g., *United States v. Morgan*, 313 U.S. 409, 421 (1941); *Withrow v. Larkin*, 421 U.S. 35 (1975); *Schweiker v. McClure*, 456 U.S. 188 (1982). Still, quite apart from Batagiannis's agreement that the school board could hold any required hearing is the fact that having strong views about wise public policy has never been understood to be the sort of "bias" that either commissioners or judges must avoid. That's why the Federal Trade Commission may both issue a complaint (taking a stand about what the antitrust laws require) and adjudicate the claim that their complaint initiates. See *FTC v. Cement Institute*, 333 U.S. 683 (1948). Members of the FTC, the SEC, the NLRB, and many other agencies carry out their views through adjudication as well as rulemaking, and the rights of the respondents in these proceedings are protected not by insisting that the commissioners arrive with empty heads but by ensuring an opportunity for judicial review of each decision, so that the agency's application of law to the facts may be put to the test before someone with no personal knowledge of the

disputed facts. See *Hortonville Joint School District v. Hortonville Education Association*, 426 U.S. 482, 493 (1976) (school board's familiarity with the facts did not disqualify its members). So far as the Constitution is concerned, then, members of the West Lafayette school board are entitled to act on their views about how the schools should be run.

Aside from her claim of bias, Batagiannis's objections to the hearing do not occasion much analysis. She contends, for example, that the reasons the board gave for ending her employment "impugned her integrity." There is no constitutional right to be free of defamation, see *Paul v. Davis*, 424 U.S. 693 (1976), and although there may be a right to a hearing when defamatory statements interfere with employment, see *Codd v. Velger*, 429 U.S. 624 (1977), a hearing is just what Batagiannis received. Her complaints about a lack of pre-hearing discovery assume that there is such an entitlement, which there isn't. There is no constitutional right to discovery even in criminal prosecutions. See *Wardius v. Oregon*, 412 U.S. 470 (1973). Batagiannis received a hearing considerably more elaborate (it lasted four evenings) and trial-like (it included cross-examination by counsel) than the informal exchange that the Supreme Court has held to be sufficient. The Court requires "some opportunity for the employee to present his side of the case". *Loudermill*, 470 U.S. at 543. Batagiannis received that and more.

As for her contention that the board retaliated against her because she filed a suit in state court: why is that actionable under 42 U.S.C. §1983? That statute provides relief for state actors' violations of the Constitution and laws of the United States, but a suit in state court and resting on state law is neither. Although speech in the course of litigation may be protected by the first amendment, see *BE&K Construction Co. v. NLRB*, 536 U.S. 516 (2002), the Justices added that this does not relieve litigants of all costs arising from litigation—such as awards of

attorneys' fees and sanctions for frivolous arguments. *Id*. at 537. State courts are quite capable of protecting access to their own processes; using the Constitution to achieve that objective risks turning all claims arising under state law into federal offenses, which §1983 is not designed to do.

Speech, in or out of court, may be informative—and, for policymaking officials, the basis of adverse action. Consider, for example, what would happen if the Secretary of State in a Republican administration were to write an op-ed piece endorsing the foreign-policy platform of the Democratic candidate in an upcoming election. The op-ed piece would be speech, but elected officials may insist that their policymaking officials support their programs, and the cabinet officer could be fired. See *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 74 (1990). We applied this principle recently to hold that assistant wardens in Illinois prisons may be hired and fired on political grounds. *Riley v. Blagojevich*, 425 F.3d 357 (7th Cir. 2005). Superintendents of education, who exercise greater discretion than assistant wardens, likewise may be hired and fired on the basis of speech implying support for, or opposition to, the elected officials' programs. By filing suit against the board, Batagiannis made it clear that she and the elected officials were no longer operating as a team; the board was entitled to take that into consideration. Indeed, judges do the same in employment-discrimination cases involving non-policymaking personnel. One common reason for denying reinstatement, and awarding front pay instead, is that the litigation has made a harmonious employment relation impossible. See, e.g., *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1370 (7th Cir. 1992). The board's decision here—noting that the elected officials had lost confidence in Batagiannis in part because she had filed suit rather than working out differences in private—is in the same spirit.

What's more, this particular claim of retaliation is incoherent on its own terms. Recall the foundation of the

state suit: Batagiannis insisted that the suspension was a *de facto* discharge and demonstrated that the board *already* had decided to get rid of her. The formal decision in 2004 cannot be "retaliation" for the state suit when it just confirms something that, according to the litigation, preceded the suit's commencement.

AFFIRMED

A true Copy:

   Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*