In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-2204

STEVEN D. HALFHILL,

*Plaintiff-Appellant,*

v.

NORTHEAST SCHOOL CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. 2:04-cv-0296—**John Daniel Tinder**, *Judge.*

ARGUED NOVEMBER 9, 2006—DECIDED DECEMBER 28, 2006

Before BAUER, POSNER, and FLAUM, *Circuit Judges.*

FLAUM, *Circuit Judge.* Steven D. Halfhill worked as a third-grade teacher for the Northeast School Corporation (Northeast) in Sullivan County, Indiana during the 2001-2002 and 2002-2003 school years. Northeast elected not to renew his teaching contract for the 2003-2004 school year because of four incidents in which Halfhill made physical contact with students when disciplining them. Halfhill sued, alleging that Northeast violated his procedural due process rights, in violation of 42 U.S.C. § 1983, and breached his employment contract, in violation of state law. The district court granted Northeast's motion for summary judgment and denied Halfhill's cross-motion

for summary judgment. Halfhill appeals both rulings. For the following reasons, we affirm.

## I.  Background

Halfhill worked as a third-grade teacher at Northeast for two years, but Northeast declined to renew his teaching contract for a third year. In support of its decision, Northeast claimed that Halfhill demonstrated a lack of professionalism on four occasions. In September 2001, while Halfhill was supervising an indoor recess, he grabbed a misbehaving student (by the back of the neck or arm, the parties disagree) and led him to an area where the two could talk in private. The boy's parents complained to the principal, Mark Baker, who spoke with Halfhill and advised him of the limited circumstances in which a teacher is permitted to touch a student.

On September 28, 2002, Halfhill disciplined another misbehaving student by placing his thumb and index finger under the child's chin and pressing it upward. Halfhill touched the student in this manner to force the child to make eye contact with him. That student's parents also complained, and Baker met with Halfhill a second time, advising him that a teacher is "going to lose" anytime he touches a student.

In October 2002, parents complained about allegations that Halfhill had choked and kicked a student and looked into the girls' bathroom. Baker, Halfhill, and school superintendent Richard Walters met with the parents to discuss the allegations. At the meeting, Halfhill acted in a negative and hostile manner, and Baker reminded Halfhill that the parents had a right to express their concerns. Though a subsequent investigation found no merit to the parents' allegations, Halfhill's attitude during the meeting concerned Baker and Walters.

The last incident, which influenced Northeast's decision more than the others, occurred in April 2003. A scuffle between two students prompted Halfhill to escort one of the students to the office by placing his hand high on the student's back or neck. The student complained that Halfhill hurt him, and the student's mother contacted the school. Baker and Walters met soon afterwards and decided to recommend that the Northeast School Board (Board) not renew Halfhill's contract for the next school year. The fact that Halfhill would receive certain tenure privileges along with his next teaching contract influenced their decision.

On April 22, 2003, Walters and Baker informed Halfhill that they were recommending that the Board not renew his contract and explained the reasons for their decision. Halfhill responded by voicing his disagreement. On April 28, the Board held a special meeting to discuss the renewal of Halfhill's contract. After an executive session in which Baker and Walters answered the Board's questions about Halfhill and made their recommendation against rehiring him, the Board voted, in an open session, not to renew Halfhill's contract. The Board notified Halfhill about its decision the next day, which was two days before the statutory deadline for informing a non-permanent teacher of a decision not to renew his contract. Had the Board passed the statutory deadline without making a decision, Halfhill's employment contract would have been renewed automatically. *See* Ind. Code § 20-6.1-4-14 (now repealed)

Halfhill's contract incorporated the terms of a "Master Contract" applicable to all teachers in the school district and contained a number of provisions relevant to this dispute. Article V provided, "An employee shall not be disciplined, reprimanded, suspended, reduced in compensation, discharged, or deprived of any professional advantage without just cause." Article XIII required that

school administrators evaluate each teacher's performance on a yearly basis using a particular evaluation form. The form provided space for an administrator to make comments about the teacher's performance and to mark whether "the teacher's contract should be renewed," "the teacher should be transferred to a different assignment where he/she could serve in a more effective and satisfactory way," "the teacher should be given permanent status," or "the teacher's contract should be non-renewed." Article XIII also allowed the teacher to rebut, in writing, any negative comment on the evaluation form. Halfhill received three evaluations during the time he worked for Northeast. The last one, which he received on November 19, 2002, recommended that his contract be renewed.

Two other provisions of Halfhill's contract are also relevant. Article XIV discussed dismissal procedures and required the Board to provide a hearing to any teacher whose administrative staff recommended the teacher's dismissal. Article XV outlined a teacher's right to grievance procedures. If a teacher believed that the school had violated one of the terms of his teaching contract, then under Article XV, that teacher could submit a grievance to his or her principal. The principal had five days to respond to the grievance, and if the teacher was not satisfied with the response, then the teacher could appeal successively to the superintendent, an arbitrator, and, finally, the Board. The Board made a final decision about the grievance, and its decision was binding on all parties.

On May 1, 2003, Halfhill, pursuant to his rights under Ind. Code § 20-6.1-4-14, requested that the Board provide him with a written explanation of the reasons for its decision not to rehire him. On May 6, the Board provided its explanation, which recounted the four incidents discussed above. Halfhill then filed an Article XV grievance with Baker and requested a meeting with the Board so that he could explain why its decision was improper. On

May 9, Baker responded in writing to Halfhill's grievance and declined to reconsider his recommendation to the Board. On May 14, 2003, Halfhill appealed Baker's response to Superintendent Walter.

On May 22, Halfhill met with the Board to discuss its decision. He brought with him a lengthy written statement "as a kind of rebuttal to Dr. Baker's reasoning . . . for non-renewal," but the Board refused to read the letter. Halfhill Dep. at 31. Nevertheless, the Board gave Halfhill and his attorney an opportunity to tell Halfhill's side of the story. *Id.* The Board did not tell Halfhill what Baker or Walters had said about him, and Halfhill had no right to call or cross-examine witnesses. Halfhill also claims that the presiding member of the Board told him that the May 22 meeting was not a hearing. On May 28, the Board voted to affirm its decision not to renew Halfhill's contract.

Halfhill then appealed his grievance to non-binding arbitration. Halfhill's representative in the arbitration, Dan Hartz, testified that he contacted Walters prior to the January 30, 2004 arbitration hearing and that Walters told him arbitration was a waste of time because "regardless of what the arbitrator decides it is only advisory and it comes back to the same group of people, the Board of Education, who have already made the decision." Appellant's Br. at 40. As it happened, Walters' prediction was accurate. The arbitrator recommended that the Board reinstate Halfhill to his old position, concluding that Northeast discharged him without just cause in violation of Article V. On August 16, 2004, however, the Board voted to reject the arbitrator's recommendation.

On November 12, 2004, Halfhill filed this lawsuit, alleging that Northeast had breached his employment contract and violated his procedural due process rights. On April, 6, 2006, the district court granted Northeast's and

denied Halfhill's motion for summary judgment. It ruled that Halfhill possessed no property interest in the renewal of his teaching contract; that even assuming Halfhill possessed such an interest, Northeast provided him with adequate process; and that Northeast did not breach his employment contract.

## II.  Analysis

The Court reviews the district court's grant of summary judgment de novo. In the course of our review, we consider the facts in the light most favorable to Halfhill, the non-moving party, and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A.  Property Interest

Halfhill contends that Northeast deprived him of a property interest without providing adequate due process protections. To prove a violation of procedural due process rights, a plaintiff must show that the State deprived him of a protected liberty or property interest and that the deprivation occurred without adequate due process. *Brown v. City of Michigan City, Indiana*, 462 F.3d 720, 728 (7th Cir. 2006). "A protected property interest in employment can arise from a state statute, regulation, municipal ordinance, or an express or implied contract— those 'rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Johnson v. City of Fort Wayne, Indiana,* 91 F.3d 922, 943 (7th Cir. 1996) (quoting *Border v. City of Crystal Lake*, 75 F.3d 270, 273 (7th Cir. 1996)).

Halfhill appropriately concedes that he had no right to continued employment under Indiana law. When the Board

decided not to renew Halfhill's contract, the teaching contract of a teacher with more than two years of experience (permanent and semi-permanent teachers) continued indefinitely until the teacher signed a new contract, and a school board could not cancel the contract without good cause. Ind. Code § 20-6.1-4-10, 10.5 & 11 (now repealed). Teachers with two or fewer years of experience (non-permanent teachers), however, had no right to continued employment, though they had to be informed of a non-renewal decision by May 1. *Id.* § 20-6.1-4-14(a)(1) (now repealed).

Halfhill maintains, instead, that he possessed property rights that arose out of his employment contract. *See Batagiannis v. W. Lafayette Cmty. Sch. Corp.*, 454 F.3d 738, 740 (7th Cir. 2006) (holding that a contractual right can create a protectable property interest). Halfhill first argues that he had a property right that stemmed from Article V's "Just Cause" provision, which stated that an employee could not be "disciplined, reprimanded, suspended, reduced in compensation, discharged, or deprived of any professional advantage without just cause." Northeast responds that it did not discipline or discharge Halfhill but merely declined to renew his teaching contract, a decision on which Article V has no bearing.

At the time of the Board's decision, Indiana law provided that a school board could decline to renew a non-permanent teacher's contract for any reason. Ind. Code § 20-6.1-4-14(i)(1) (now repealed). In addition, the law presumed that these statutory provisions were a part of every teacher's contract. *See, e.g.*, *Bd. of Trs. of Hamilton Heights Sch. Corp. v. Landry*, 560 N.E.2d 102, 108 (Ind. Ct. App. 1990). In light of this presumption, the Board's decision not to renew Halfhill's contract was not discipline, discharge, or the deprivation of any professional advantage. Halfhill had no expectation of continued employment beyond the end of the 2002-2003 school year, and he

received everything to which he was entitled under his contract. Indeed, to hold otherwise would require us to conclude that Northeast elected to give tenure rights to teachers on their first day on the job—an unlikely proposition.

We find persuasive a decision by the Montana Supreme Court, which considered a nearly identical question and arrived at the same result. *See Irving v. Sch. Dist. No. 1-1A, Valley County*, 248 Mont. 460, 468, 813 P.2d 417, 422 (1991). In *Irving*, the plaintiff was a non-tenured teacher whose contract was not renewed. She claimed that she had a contract right to continued employment based on a contract provision which stated, "No teacher shall be disciplined, dismissed, reduced in rank or compensation[ ], or deprived of any professional advantage without due process." *Id.* The court concluded that "[a]s a nontenure teacher who had no legitimate expectation of contract renewal, [the plaintiff] was not dismissed or deprived of any professional advantage. She received all benefits, privileges[,] and rights she was entitled to." *Id.* As in *Irving*, Halfhill received all the benefits that his contract provided him. Consequently, he was not disciplined, discharged, or deprived of any professional advantage.

Halfhill next argues that he had a property right that arose out of Article XIII. That provision, however, simply required the school to evaluate his performance before January 1 of each school year, and the parties agree that Baker conducted those evaluations. As a result, if Article XIII created a property right, Halfhill was not deprived of it.

Halfhill also contends that his November 19, 2002 evaluation gave him a right to be notified by January 1, 2003 whether Baker would recommend that the Board renew his contract. In other words, Halfhill maintains,

once Baker advised Halfhill on November 19 that he would recommend that Halfhill's contract be renewed, Baker could not change his mind, even if—as Northeast alleged here—Halfhill engaged in subsequent misconduct. The Court rejects this argument. Nothing in Halfhill's evaluation form said that Baker's perceptions about Halfhill's performance were set in stone. Halfhill attempts to manipulate this check-the-box, mid-year evaluation form into an unalterable right to receive a positive year-end recommendation, but neither Article XIII nor the evaluation form provided such a right.

Halfhill also claims that he possessed a right, under Article XIV, to receive certain due process procedures before being dismissed. Putting aside whether Halfhill can assert a property right in these procedures, *see Kyle v. Morton High Sch.*, 144 F.3d 449, 451 (7th Cir. 1998); *Shvartsman v. Apfel*, 138 F.3d 1196, 1199 (7th Cir. 1998), Northeast did not dismiss Halfhill from his position; it declined to renew his contract. Accordingly, he had no right to invoke Article XIV.

Finally, Halfhill maintains that his Article XIII evaluation, together with his Article XIV rights, created a "mutually explicit understanding" that Northeast would notify him by January 1, 2003 if his contract was not going to be renewed. *See Crull v. Sunderman*, 384 F.3d 453, 464 (7th Cir. 2004). However, as we have already commented, Halfhill's evaluation form did not assert that Baker was permanently bound by his November 19, 2002 decision to recommend contract renewal. Rather, the November 19 evaluation provided Halfhill an assessment of Baker's current impressions about Halfhill's performance. The form said nothing about what would happen if those impressions changed. Under these circumstances, no jury reasonably could find that Halfhill and Northeast had a mutual understanding that Northeast would renew Halfhill's contract.

**B. Due Process**

Even assuming, for purposes of argument, that Northeast deprived Halfhill of a property right, Northeast provided Halfhill more than adequate process. To determine what process is due when the State deprives an individual of property, courts look at three factors: (1) the private interest affected by the official action; (2) the risk of erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional procedural protections; and (3) the government's interest in maintaining the current procedures. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The Supreme Court has held that where adequate post-deprivation procedures are available, an individual with a property interest in his continued employment is entitled only to minimal predeprivation process: "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

Though Halfhill contends that he did not receive adequate predeprivation process, the record indicates otherwise. In the termination context, predeprivation process may occur any time before a governmental entity stops providing an employee benefits, even if that process occurs after the termination decision. *See Krentz v. Robinson*, 228 F.3d 897, 903 n.4 (8th Cir. 2000). Halfhill has not offered evidence that he was deprived of a benefit before August 15, 2003, the date that the 2003-2004 school year began. Prior to August 15, Walters and Baker met with Halfhill, told him that they were going to recommend that the Board not renew his contract, and allowed him to express why he disagreed with their decision. In addition, the Board provided Halfhill its reasons for not renewing his contract, met with him for more than an hour, and allowed him to present his side of the story. This

predeprivation process was more than constitutionally adequate.

With regard to postdeprivation process, Halfhill concedes that the Article XIV grievance procedure was nominally adequate but nevertheless maintains that the procedure he took part in was a sham. *See Ryan v. Ill. Dept. of Children & Family Servs.*, 185 F.3d 751, 762 (7th Cir. 1999). In *Ryan*, the plaintiffs, in response to a motion for summary judgment, offered evidence that their employer, the Illinois Department of Children and Family Services (DCFS), manufactured reasons for their termination, that an outside attorney hired to review the plaintiffs' terminations believed that DCFS had made up its mind to discharge the plaintiffs before they received a hearing, and that one of the individuals hired to investigate the plaintiffs believed that DCFS intended to terminate the plaintiffs regardless of the evidence. As a result, we held that the plaintiffs had offered evidence that the proceedings were a sham. *Id.*

Halfhill's evidence on this point is far less compelling than that offered in *Ryan*. He first offers Walters' statement that arbitration was a "waste of time" because the Board had previously rejected Halfhill's argument. However, Walters' statement—unlike the more direct evidence cited in *Ryan*—provides no insight into whether the various board members had an open mind when considering whether to accept the arbitrator's decision. Walters' statement was nothing more than a prediction about the result of a procedure in which Walters took no part.

Halfhill also offers the Board's disagreement with the arbitrator's decision, but the Board's ultimate conclusion is not evidence of bias. It is simply the outcome of the procedure to which Halfhill assented in his collective bargaining agreement. *See Batagiannis*, 454 F.3d at 741

(holding that a school board, which had decided to fire the plaintiff in 2002 and 2003, was not biased when it reviewed its decision in 2004, because the 2004 hearing was exactly what the plaintiff had agreed to in her collective bargaining agreement); *Honore v. Douglas*, 833 F.2d 565, 568 (5th Cir. 1987) (holding that a professor could not demonstrate a procedural due process violation where the Board of Regents had ultimate decision-making authority and rejected a hearing committee's recommendation to grant the professor tenure). Nor can Halfhill demonstrate bias by pointing out that the Board's final decision came after it had already voted once not to renew Halfhill's contract. *See Hudson v. City of Chicago*, 374 F.3d 554, 563 (7th Cir. 2004) (holding that the plaintiffs received adequate predeprivation process where a police department made a preliminary decision to terminate the plaintiffs, considered additional information submitted by the plaintiffs, and then decided to maintain its original decision in favor of termination). Accordingly, the district court correctly granted Northeast's and denied Halfhill's motion for summary judgment on Halfhill's procedural due process claim.

## C. Breach of Contract

For the reasons discussed above, Northeast did not breach Halfhill's employment contract by not renewing it for a third year. The district court correctly granted Northeast's and denied Halfhill's motion for summary judgment on Halfhill's breach of contract claim.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's rulings.

No. 06-2204                                                    13

A true Copy:

    Teste:

                _____

                *Clerk of the United States Court of*
                *Appeals for the Seventh Circuit*