Francisco SALAS, Plaintiff,

v.

WISCONSIN DEPARTMENT OF CORRECTIONS, a state governmental agency; Richard F. Raemisch, individually; William A. Grosshans, individually; Denise A. Symdon, individually; Marie Finley, individually; and Leann Moberly, individually, Defendants.

No. 05–C–399–C.

United States District Court, W.D. Wisconsin.

April 25, 2006.

David E. Lasker for Plaintiff.

Richard Moriarty, Assistant Attorney General, Madison, WI, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

In this civil action for monetary relief, plaintiff Francisco Salas contends that defendants Richard Raemisch, William Grosshans, Denise Symdon and Leann Moberly, all employees of the Wisconsin Department of Corrections, discriminated and retaliated against him in violation of his rights under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1983. Jurisdiction is present under 28 U.S.C. § 1331.

On March 18, 2003, plaintiff was terminated from his position as a Wisconsin Department of Corrections probation and parole agent because of his alleged failure to supervise offender Kevin Hageman and for his alleged falsification of documents relating to Hageman. Although plaintiff concedes that Hageman "fell through the cracks," plaintiff contends that he was not guilty of the violations with which he was charged, and that even if he had been guilty, the punishment imposed upon him was excessive when compared to the discipline imposed upon other employees found guilty of similar infractions. Plaintiff believes his termination was a result of discrimination against him because of his color and national origin and was an act of retaliation against him because of his participation in a government investigation of a discrimination claim filed against the department by one of plaintiff's co-workers.

Before the court is defendants' motion for summary judgment, which will be granted in its entirety. Defendants' motion will be granted with respect to plaintiff's Title VII discrimination and retaliation claims because plaintiff has not introduced evidence sufficient to show that his complaint to the Equal Employment Opportunity Commission (EEOC) was filed within the necessary time limits. The motion will be granted with respect to plaintiff's due process claim because he has not produced evidence supporting his contention that the three pre-disciplinary hearings he received were shams. The motion will be granted with respect to plaintiff's equal protection claim because plaintiff has not adduced evidence demonstrating that he was treated differently from his similarly situated non-Hispanic co-workers or that defendants' decision to terminate his employment was motivated by defendants' animosity toward him because of his national origin. Finally, the motion will be granted with respect to plaintiff's claim that defendants retaliated against him in violation of the First and Fourteenth Amendments because the Fourteenth Amendment does not secure employees from retaliatory conduct and because defendants had no knowledge of plaintiff's protected speech at the time they made the decision to terminate his employment.

Before turning to the undisputed facts, several preliminary matters merit attention. First, in response to plaintiff's submissions in opposition to summary judgment, defendants moved to strike fact witnesses and documentary evidence that they contend were not disclosed to them as required by Fed.R.Civ.P. 26(A)(1). Dfts.' Reply Br., dkt # 32, at 16–21. Plaintiff's counsel, David Lasker, riposted by submitting an affidavit in which he avers that he offered to provide defendants with all relevant information but received no response to his offer. Lasker Aff., dkt. # 37. In response to Lasker's affidavit, defendants have asked to withdraw their Rule 26(A)(1) arguments, reserving them for argument as motions in limine were the case to proceed to trial. Because defendants have abandoned their

Rule 26 objections with respect to the motion for summary judgment, I will accept all documents and affidavits submitted by plaintiff without regard to defendants' allegations.

Next, I note that both parties have proposed as fact inferences they have drawn from statements contained in various documents relevant to this lawsuit. The parties do not appear to dispute the texts of the documents at issue; rather, they dispute the inferences to be drawn from them. Where inferential facts proposed by the parties are disputed, but the underlying text is not, I have set forth the undisputed text from which the competing inferences have been drawn. From the parties' proposed findings of fact and from documents authenticated in the record, I find the following facts to be undisputed.

## UNDISPUTED FACTS

### A. *Parties*

Plaintiff Francisco Salas is a 58–year-old Hispanic male who was born July 28, 1947. From January 27, 1986, until March 18, 2004, plaintiff was employed by the Wisconsin Department of Corrections.

Defendant Wisconsin Department of Corrections is a state agency whose primary office is located in Madison, Wisconsin.

Defendant Richard Raemisch is Deputy Secretary of the Department of Corrections.

Defendant William Grosshans was the administrator of the Wisconsin Department of Corrections Division of Community Corrections from March 16, 1997 to January 5, 2003, and has been the division's assistant administrator since January 5, 2003. From January 5, 2003, until February 3, 2003, he concurrently served as acting administrator.

Defendant Denise Symdon served as Regional Chief of Region I of the Wisconsin Department of Corrections Division of Community Corrections from May 7, 2000, to June 20, 2004. She has been the assistant administrator of the Division of Adult Institutions since June 20, 2004.

Defendant Marie Finley was Assistant Regional Chief of the Division of Community Corrections before her retirement on September 30, 2004.

Defendant Leann Moberly was a field supervisor for the Division of Community Corrections in Janesville, Wisconsin from May 4, 2003, to May 16, 2004. From May 15, 2004 to the present, she has been a field supervision in Madison, Wisconsin.

### B. *Plaintiff's Employment with the Department of Corrections*

#### 1. *Work history*

From January 1986 to June 1989, plaintiff was employed by the Wisconsin Department of Corrections Division of Adult Institutions as a correctional officer. He was promoted to the position of Social Worker in June 1989, Social Worker 2 in June 1991 and Social Worker 3 in June 1993. While employed with the Department of Adult Institutions, plaintiff trained all newly hired social workers entering the prisons. He was the team leader for the Emergency Response Unit's hostage negotiation team. In addition, he helped develop the NEXUS drug and alcohol treatment program. In August 1993, plaintiff became a Licensed Social Worker, certified by the Wisconsin Board of Social Workers, Marriage and Family Therapists and Professional Counselors.

In October 1995, plaintiff was transferred to the Division of Community Corrections as a Senior Probation and Parole Agent. In that position, plaintiff co-facilitated sex offender, anger management and cognitive intervention treatment groups. On October 7, 2001, plaintiff transferred to Unit 113 of the Madison, Wisconsin office

of the Division of Community Corrections. As a community corrections agent, plaintiff was a member of the American Federation of State, County and Municipal Employees, a labor union representing employees of the Wisconsin Department of Corrections. Under the terms of the union's contract with the department, union members could be terminated only for just cause.

## 2. The BI supervision program

For some time prior to June 30, 2002, the Wisconsin Department of Corrections maintained a contract with the BI Corporation (a Colorado-based telephone service company) to provide call-in reporting for low-risk inmates on probation supervision. Offenders in the program reported to the Department of Corrections by calling the BI Corporation and responding to telephone prompts. Offenders would be billed for each phone call; money collected from the phone charges was used to fund the program and pay the offenders' "supervision fees." One of the offenders who participated in the BI program was Kevin Hageman, a low-level offender on probation for the purpose of insuring he paid his court-ordered restitution. Hageman stopped making restitution payments on February 22, 2001.

When an offender failed to call as required by the terms of his probation, the BI Program would notify the department of the offender's failure to report. A letter would be sent to the offender warning him to send a check to his agent to cover the missed fees and not to miss any further calls. The letters bore the name and telephone number of the agent assigned to supervise the offender. (The parties seem to dispute whether the letters were generated and mailed to offenders automatically or whether individual probation and parole agents prompted the letters to be sent.)

## 3. Plaintiff's work at the Madison office

When plaintiff transferred to the Madison office of the Division of Community Corrections in October 2001, he assumed responsibility for Case Load #11311, which included approximately 350 offenders on BI supervision in Green, Rock and Dane Counties. When the BI program ended in June 2002, plaintiff transferred from Unit 113 to Unit 102. (The parties dispute whether plaintiff retained responsibility for the BI offenders assigned to him before the BI program ended.)

In September 2002, the offenders who resided in Dane County and who had participated in the BI program were divided among the agents in Unit 102. Approximately ten cases were assigned to each agent. As plaintiff began entering the cases newly assigned to him into his computer, he tried to obtain information from the electronic BI Program file. When he was unable to access the program, he conferred with the Department of Corrections' Central Office and was told that all electronic BI Program files had been destroyed after the BI program contract expired.

The Department of Corrections used a computer program called the Offender Activity Tracking System (OATS) to manage information relating to offenders. The program maintains a "reminders" list that displays pre-sentence investigation reports, initial case plans, risks and needs reassessment forms (called DOC–506 forms), case plans and other documents that are overdue or need to be completed by an agent within 45 days. The program did not prompt plaintiff to complete or submit forms relating to Hageman.

On April 23, 2003, plaintiff's supervisor, Nancy Dibenedetto, reviewed plaintiff's cases and noted the work plaintiff needed to complete. She did not indicate that

plaintiff needed to complete any work with respect to Hageman.

In September 2003, Hageman's father called plaintiff's supervisor, Wesley Ray, and told Ray that Hageman was in a Chicago hospital suffering from a serious medical problem. Hageman's father asked Ray for help with his son. This contact prompted the department to begin an internal investigation into plaintiff's work with Hageman.

### C. *Termination of Plaintiff's Employment*

On September 23, 2003, plaintiff was ordered to report to Ray, who questioned him about his supervision of Hageman. Plaintiff told Ray he had no knowledge of Hageman, and stated that Hageman "fell through the cracks." Later that day, Hageman's file was taken from plaintiff and the case was assigned to a new agent.

Defendant Symdon coordinated plaintiff's disciplinary investigation and assigned defendant Moberly to interview plaintiff. (The investigatory interview is the first step in the department's disciplinary process.) Defendant Moberly reviewed Hageman's file and plaintiff's employment file in preparation for the investigatory interview, which was held on November 17, 2003. Cynthia Hopkins, plaintiff's union representative, attended the meeting with plaintiff.

At the interview, defendant Moberly questioned plaintiff about his alleged failure to supervise Hageman according to the standards listed in the department's operations manual. Plaintiff acknowledged that he had not seen Hageman from September 23, 2002 to September 23, 2003, and that he had not issued an apprehension report for Hageman. Plaintiff told defendant Moberly that when he told Ray that Hageman had "f[allen] through the cracks," he meant that he "was supposed to be seeing the client and didn't."

In a report to defendant Symdon dated November 19, 2003, defendant Moberly wrote:

Agent Francisco Salas failed to follow Probation and Parole Operations Manual standards in the supervision of Kevin Hageman … supervised by him from 8/17/01 through 9/23/03.

Mr. Salas admits he did not provide supervision of the offender, Mr. Hageman from the time BI was dissolved on 6/30/02 through 9/23/03, therefore, did not complete any chronological entries. Mr. Salas admits that he had no contact with Mr. Hageman during this time frame.

While on BI, 8/17/01–6/30/02, Mr. Salas asserts that there were chronological entries made by him which are located in the BI program. I cannot confirm if Mr. Salas completed chronological entries within this program.

Mr. Salas recalls that Mr. Hageman was classified at Administrative [status]. Ms. Hopkins asserts that a management decision was made to classify all BI to Minimum when the BI caseload was absorbed through Unit 102. OATS indicates that Mr. Hageman was classified at Administrative from 11/19/01 until 10/28/02, at which time he was classified at Minimum through a 506–reclassification form.

Mr. Salas reports that he treated this case as a collection case and didn't view this offender as a priority. When BI was dissolved, Mr. Salas reports that he inherited an active caseload that included revocations and serious offenders, both of which [sic] were a higher priority.

Defendant Moberly recommended that plaintiff's employment be terminated.

On December 4, 2003, defendant Finley, then Assistant Regional Chief of the Department of Corrections, conducted a pre-

disciplinary meeting with plaintiff. After questioning plaintiff, defendant Finley issued a report in which she concluded that plaintiff was responsible for supervising Hageman from November 9, 2001, to October I, 2003. Defendant Finley found no offender report forms or chrono notes in Hageman's file dated from October 26, 2001 to September 28, 2003. (She did not address plaintiff's contention that these documents had been completed electronically and were later destroyed.) According to defendant Finley, Hageman's file did not contain any waivers of contact standards, home visit waivers, or apprehension request forms completed by plaintiff. On January 20, 2004, defendant Finley added an addendum to her report detailing the questions she had asked plaintiff regarding the DOC–506 Form that reclassified Hageman from minimum to medium supervision.

On February 3, 2004, defendant Symdon conducted a third pre-disciplinary hearing with plaintiff. At defendant Symdon's request, plaintiff retrieved Hageman's file from the new agent to which the case was assigned and brought to file with him to the hearing. When plaintiff arrived at the hearing, defendant Symdon asked him to show her the file information he had used to complete Form 506. Plaintiff asked to see the allegedly falsified Form 506 and was told that it was not available.

In a report dated February 4, 2004, defendant Symdon concluded that plaintiff could have "re-engaged supervision" with Hageman on many occasions and that plaintiff should have issued an apprehension request. Defendant Symdon added Rule 6 (falsifying records, knowingly giving false information, or knowingly permitting, encouraging or directing others to do so) to the list of work rules plaintiff was alleged to have violated. Defendant Symdon recommended to her superiors that plaintiff's employment be terminated.

Jay Taylor is employed by the Department of Corrections as a Human Resources Coordinator. When an employee investigation packet is submitted, Taylor is the first to review it and provide a recommendation for discipline. He then provides the packet of information and his recommendation to the Division Administrator. After review by the Administrator, the packet goes to Employment Relations and then to the Office of Diversity (only on severe suspensions or terminations) for review and approval. If the packet is a termination, it will be sent to the Office of the Secretary for final review and approval. On March 2, 2004, Taylor, along with defendant Grosshans, Judy Trampf and Sheri Harris, voted unanimously to recommend that plaintiff's employment be terminated. On March 4, 2004, plaintiff's investigation information packet was forwarded to Department Deputy Secretary Cindy O'Donnell. On March 17, 2004, O'Donnell approved plaintiff's termination.

In a letter dated March 18, 2004, defendant Raemisch terminated plaintiff's employment because of plaintiff's alleged violation of Wisconsin Department of Corrections Work Rules 2, 4 and 6. Work Rule 2 requires employees to follow policies and procedures, including the fraternization policy and arrest and conviction policy. Work Rule 4 prohibits negligence in the performance of assigned duties. Work Rule 6 prohibits employees from falsifying records, knowingly giving false information or knowingly permitting, encouraging or directing others to do so. No department employee other than plaintiff has ever been terminated for falsifying a Form 506 document.

At the time plaintiff was fired, he worked at the Division of Community Corrections office located in Madison, Wisconsin. The office employed 33 people. Plaintiff was the only Hispanic male and

one of only two Hispanic employees in the office. Prior to his termination, plaintiff had never been disciplined by the Department of Corrections.

### D. *Involvement in Darren Rogers's EEOC Complaint Investigation*

At some point in 2003, a community corrections agent named Darren Rogers filed a complaint with the United States Equal Employment Opportunity Commission (EEOC), alleging that he had been the object of racial discrimination. Plaintiff agreed to testify on Rogers's behalf.

Terri Rees is a paralegal employed by the Department of Corrections' Office of Legal Counsel. Rees's duties include responding to charges filed against the department with EEOC. On March 11, 2004, Rees received a letter from EEOC Investigator Shannon Lemke. In the letter, Lemke stated:

On November 28, 2003, we received information from you regarding [Darren Rogers's] charge. After reviewing the information, it will be necessary for [sic] an onsite investigation. The following individuals will need to be interviewed: Brenda Stacey, Fransico [sic] Salas, Brent Boehlke, Dawn Lokken, Tanya Choice, Linda Miller, Cynthia Hopkins and Nicole Shulfer.

The proposed dates are March 23, March 24, March 30 and March 31, 2004, please call me to schedule a date by March 17, 2004.

Rees Aff, dkt. # 18, Ex. A. The day after she received Lemke's letter, Rees sent the following email message to several department employees, including defendants Grosshans and Symdon:

The EEOC investigator has asked to interview a number of staff members in regard to this discrimination complaint. They are as follows: Brenda Stacey, Francisco Salas, Brent Boehlke, Dawn Lokken, Tanya Choice, Linda Miller, Cynthia Hopkins and Nicole Shulfer.

Because these staff members are in three different locations, for convenience, we will probably schedule all of the interviews here in Central Office. O[ffice of] L[egal] C[ounsel] is only entitled to attend the interview with Mr. Boehlke since he was a supervisor at the time of the alleged incidents. Otherwise, for the rest of the interviews, we can request to attend but we are not entitled to attend.

I will be contacting each staff member to set up the interviews, but I wanted to let you know of the request we have received from the EEOC. The EEOC does not conduct on-site interviews very often, but when they do, we try to accommodate them as much as we can. The interview dates we are looking at are March 30 and 31.

Please let me know if you have any questions or concerns.

Rees Aff, dkt. # 18, Ex. B. Later that day, Rees sent an email message to plaintiff, Stacey, Boehlke, Lokken, Choice, Miller, Hopkins and Shulfer, informing them that an EEOC investigator wanted to "interview [each of them] regarding a discrimination complaint filed by Darren Rogers." Rees Aff, dkt. # 18, Ex. C. Rees sent the message to defendant Symdon as well.

Plaintiff did not respond to Rees's email. On March 17, 2004, at approximately 9:00 a.m., Rees sent plaintiff another message, which read:

Could you please let me know which date works best for you to be interviewed by the EEOC regarding the Darren Rogers discrimination complaint[?] The two dates are March 30 and 31. I need to get back to the investigator today.

Rees Aff, dkt. # 18, Ex. D. Plaintiff responded by email several minutes later stating, "I do not feel that the site picked by you is a neutral site for an EEOC

investigation. Would you pick a different site please[?]" *Id.* At approximately 9:30 a.m., Rees responded, "We are scheduling the interviews at Central Office for the convenience of the investigator, who is coming from Milwaukee. The eight people she would like to speak to are in three different locations, including Janesville." *Id.*

At approximately 10:30 a.m., plaintiff sent Rees the following message:

I know that you are scheduling the interviews for the convenience of the investigator and yours. You did not take into consideration the feelings of others nor how they would feel coming into that place for an EEOC investigation. I for one do not feel that the Central Office is a neutral site for me. There could be a site pick[ed] that would be neutral for all concerned and that would be central for everyone coming in. The investigation site does not have to be held at Central Office, it can be held anywhere people can go without feeling pressured by the site.

You sending the notices out in a general e-mail is further prove [sic] of what I am saying. You have just isolated an individual and made everyone aware of what is going on in a personnel matter which should have been treated and handle[d] as a private matter.

Furthermore the involvement of DOC legal staff in a complaint against DOC is creating a conflict. How can you be involve[d] in a matter that is against your department[?] If nothing else it seems to me that the department is involve[d] in a complaint against themselves [sic].

*Id.* Rees responded, "I will relay your concerns to the investigator."

Hopkins, another interviewee, later raised the same concerns to Rees regarding the proposed interview site. Rees discussed the employees' concerns with Lemke. Ultimately, Rees and Lemke agreed that the eight interviewees would be given Lemke's name and telephone number and would call her to schedule their interviews individually.

Rees did not forward any of plaintiff's email messages to any defendant in this lawsuit. Defendants Symdon, Grosshans and Moberly had no personal knowledge that Salas was concerned about the way the department had handled the investigation of Darren Rogers's EEOC charge.

### E. *Discipline of Other Employees*

On July 9, 2001, Community Corrections Agent William Sorenson was disciplined for violating work rules 1 and 4 by failing to obtain criminal history information from an offender, review probation and parole rules with the offender and complete an initial intake assessment, client management classification questionnaire, adult field caseload form, and case plan. In addition, Sorenson did not complete any of his assigned tasks, never had contact with the offender and kept no chronological logs for that offender. While assigned to Sorenson, the offender was taken into custody for committing homicide. Sorenson was disciplined with a 30–day suspension.

On February 25, 2003, Community Corrections Agent Stephen Larson was disciplined for violating work rules 2 and 4 by failing to follow mandatory custody and investigation procedures in his supervision of an offender. The department found that on two occasions, Larson failed to take the offender into custody after allegations had been made regarding the offender's involvement in violent and threatening behavior. The offender subsequently murdered his girlfriend and her two-year old daughter and then committed suicide. Larson was disciplined with a 20–day suspension.

On September 5, 2003, Community Corrections Agent James Schachtschneider

was disciplined for violating work rules 1, 2, 4, and 6 by failing to issue an apprehension request for an offender on two separate occasions, although he was directed by his supervisor to do so. The department found that Schachtschneider had lied to his supervisor about issuing the request. Schachtschneider was disciplined with a 5-day suspension. He previously had been disciplined on April 10, 2003 for violating work rules 2, 4, and 6 and had received a 3-day suspension in conjunction with those prior violations.

On September 22, 2003, Community Corrections Agent Patti Dunn–Jones was disciplined for violating work rules 2, 4, and 6 by lying to her supervisor and taking no action with respect to allegations that an offender had begun to reside with a 16–year–old girl. The department found that Dunn–Jones had failed to institute a no-contact rule on the same offender regarding a different female minor and had failed to notify her supervisor of the offender's new violations, as required. Dunn–Jones was disciplined with a 10–day suspension. She had previously been disciplined on October 17, 2002 with a 3–day suspension for violating work rules 1, 2, 4, and 6 and on March 17, 2003 with a 5–day suspension for violating work rules 2, 4, and 6.

On November 4, 2003, Community Corrections Agent Joe Chiarello was disciplined for violating work rules 1, 2, 4, and 6 by failing to supervise two sex offenders. The Department found that Chiarello had not held the offenders to their court-ordered conditions, failed to meet contact standards or make collateral contacts, failed to place one offender on "sex offender rules," and failed to place the other offender on any rules at all. The department found that Chiarello failed to properly supervise a third offender, with respect to whom he falsified chronological logs and lied to his supervisor. Chiarello was found to have failed to provide a report or appear for a court review for a fourth offender on two separate occasions. Chiarello was given a 15–day suspension as a punishment for his infractions.

On December 11, 2003, Community Corrections Agent Kristine Farness was disciplined for violating work rules 1 and 4 by failing to investigate allegations of crimes committed by an offender under her supervision. The department found that Farness failed to supervise a high-risk offender and failed to issue an apprehension request for that offender after he violated his contact requirements. Farness received a written reprimand.

On March 18, 2005, Corrections Field Supervisor Colleen McCoshen was disciplined for violating work rules 11 and 13 by making several obscene and sexually explicit telephone calls to a minor who was the victim of an ongoing criminal case. As discipline for her criminal conduct, McCoshen was demoted to the position of Probation and Parole Agent.

F. *Administrative Grievance Process*

Sometime between January 7 and January 19, 2005, plaintiff received a letter from EEOC Investigator Pamela Bloom. The letter, dated January 7, 2005, read as follows:

Respondent: WI DEPT. OF CORRECTIONS

EEOC Charge No.: 260–2005–01740

FEPA Charge No.

 Jan 07, 2005

\* \* \*

Dear Mr. Salas:

This is with reference to your recent inquiry (an office visit, phone call, or correspondence) in which you alleged employment discrimination by the above-named respondent. The information provided indicates that the matter

complained of is subject to one or more of the following laws:

[x] Title VII of the Civil Rights Act of 1964 (Title VII)

[x] The Age Discrimination in Employment Act (ADEA)

[ ] The Americans with Disabilities Act (ADA)

[ ] The Equal Pay Act (EPA)

The attached EEOC Form 5, Charge of Discrimination, was drafted as a result of the information provided. To enable proper handling of this action by the Commission you should:

(1) Review the enclosed charge forms and call me if there are corrections that need to be made.

(2) Sign and date all **five** copies of the charge in the bottom left hand block where I have made an "X" on BOTH pages. The date of signature on the charge will not affect the jurisdiction date established in any original written complaint previously given to the EEOC.

(3) Return **four** of the signed charges to this office in the enclosed postage paid envelope. **Please keep one copy for your records.**

Since charges should be processed within the time limits imposed by law, *please complete these steps as soon as possible.* **A signed charge needs to be received by our office within 300 days of the last date of violation for each issue in order for it to be timely. Only timely charges can be investigated by our office.**

Please be aware that the EEOC will send a copy of the charge to the agency listed below as required by our procedures.

Wisconsin Equal Rights Division
819 North 6th Street
Room 255
Milwaukee, WI 53203

Please use the "EEOC Charge No." listed at the top of this letter whenever you call about this charge. Please notify this office of any change in address or of any prolonged absence from home ...

Enclosed with the letter were five forms, including a copy of EEOC Form 5 (Charge of Discrimination) and a form entitled "Decision Not to File or to Drop Issues." Plaintiff completed both forms. In Form 5, assigned Charge No. 260–2005–01740, plaintiff identified his discrimination charge as follows:

Discrimination Based On (*Check appropriate box(es)*.)

☐ Race ☐ Color ☐ Sex ☐ Religion ☒ National Origin

☒ Retaliation ☒ Age ☐ Disability ☐ Other (*Specify below.*)

The form identified the date of discrimination as March 19, 2004, the day plaintiff's employment was terminated. In a narrative section of the form, plaintiff identified the "particulars" of his claim:

1. I began working for the Respondent in 1986. I received several promotions during my employment, and most recently, I was employed as a Social Worker and Senior Probation/Parole Agent. Around March 19, 2004, I was discharged and walked out of the building as if I were a criminal. I had been scheduled to be a witness for another employee as part of an EEOC investigation a few days after my discharge and the Respondent had been aware that my name was on the witness list. I was the only Hispanic at the Community Corrections Johnson Street, Madison, WI location and the oldest in the department.

2. I was informed that I was discharged for failure to supervise a minimum risk offender and for falsification of document # 506.

3. I believe the Respondent violated the Age Discrimination in Employment

Act of 1967, as amended, on the basis of my age (57) and Title VII of the Civil Rights Act of 1964, on the basis of my national origin (Hispanic) and retaliation for participation in an EEOC charge (260–2003–02657) when I was discharged.

The second form plaintiff completed, "Decision Not to File or to Drop Issues," read as follows:

I have been interviewed by *Pam Bloomer*, an investigator for the U.S. Equal Employment Opportunity Commission (EEOC).[1] The investigator discussed with me the laws administered by EEOC and the time period in which I must file a charge (statute of limitations).

After discussing my situation with the above-named investigator, I have decided:

_____ Not to file a charge or complaint at this time

_____ To drop the following issue(s) from my charge:

*Race, white as a basis / e-mail and phone after discharge*

The reason for this decision is as follows:

_____ I understand that the charge or issue is not covered by the laws administered by the EEOC.

√ I have been advised by the EEOC Representative that my information does not support an allegation of discrimination in violation of the laws administered by the EEOC.

*(email & phone after discharge)*

_____ I have decided not to file at this time because I need additional time to obtain information in support of my charge and/or that I require additional time to determine if I want to pursue this matter further by filing a charge with the EEOC.

Other:

*National origin is what I meant.*

I UNDERSTAND THAT IF I DECIDE TO FILE A CHARGE I[sic] THIS MATTER, I MUST DO SO WITHIN 300 DAYS OF THE DATE OF THE ALLEGED DISCRIMINATION.

The form bears plaintiff's signature, dated January 19, 2005 and Bloom's signature, dated January 7, 2005.

### OPINION

Defendants have moved for summary judgment with respect to each of plaintiff's Title VII and § 1983 claims against them. In addition, they have moved to dismiss defendant Finley from this action because she was not served personally with a summons and copy of the complaint, as required by Fed.R.Civ.P. 4(c)(1). I will address each matter in turn, beginning with the contention that defendant Finley is not a proper defendant to this lawsuit.

#### A. *Personal Jurisdiction over Defendant Finley*

■ Rule 4(e) of the Federal Rules of Civil Procedure permits a plaintiff to serve a defendant pursuant to the law of the state in which the district court hearing the matter is located. Under Wisconsin law, before a plaintiff may serve a defendant by publication and mailing, he must first exercise reasonable diligence to serve the defendant in two preferred ways. *Welty v. Heggy*, 124 Wis.2d 318, 323, 369 N.W.2d 763, 766–67 (Ct.App.1985). First, the plaintiff must attempt to serve the defendant personally. Wis. Stat. § 801.11(1)(a). Second, if the plaintiff's attempts at personal service are unsuccessful despite reasonable diligence, the plaintiff may leave the summons and complaint with a competent family member at

---

**1.** Italicized text is handwritten on the original · form.

least fourteen years old or with an adult residing at the defendant's home. Wis. Stat. § 801.11(1)(b). Only after these two methods of service have been attempted with reasonable diligence may a plaintiff pursue service by publication.

Plaintiff did not personally serve defendant Finley; however he did publish a copy of the summons in the *Wisconsin State Journal* on September 7, 14 and 21, 2005. Lasker Aff., dkt. # 37. The question, then, is whether plaintiff exercised reasonably diligent efforts to serve defendant Finley personally before he proceeded to publish her summons.

■ Under Wisconsin law, reasonable diligence requires a plaintiff to "exhaust with due diligence any leads or information reasonably calculated to make personal service possible." *West v. West,* 82 Wis.2d 158, 166, 262 N.W.2d 87, 90 (1978). The exact parameters of reasonable diligence are not defined; however, Wisconsin case law provides some guidance. In *Welty,* 124 Wis.2d at 325, 369 N.W.2d 763, the court upheld service by publication after deputy sheriffs made nineteen attempts to serve the defendant personally. Similarly, the Wisconsin Supreme Court permitted service by publication when a plaintiff attempted to personally serve a defendant at an address where she reasonably believed the defendant would be, and the defendant refused to give the plaintiff his current address. *In re Marriage of Emery v. Emery,* 124 Wis.2d 613, 624–25, 369 N.W.2d 728, 733–34 (1985).

In contrast to the cases in which diligent exhaustion was found, Wisconsin courts have held that singular, unsuccessful attempts at service do not make substitute service proper. *See, e.g., West,* 82 Wis.2d at 167, 262 N.W.2d 87 (holding that plaintiff failed to exercise reasonable diligence by giving process server defendant's last known address when other means of finding defendant were available). In *Hase-*

*low v. Gauthier,* 212 Wis.2d 580, 589, 569 N.W.2d 97, 101 (Ct.App.1997), the court held that reasonable diligence required at least one follow up attempt at service.

■ Because the question of diligence is one that is fact-specific, it is essential for a plaintiff to describe in reasonable detail the efforts he undertook to serve a defendant before publishing her summons. In his affidavit, plaintiff's lawyer avers that he "fully complied with the provisions of Wis. Stat. § 801.11(1)(c)." However, he provides no description of the efforts in which he engaged. Under Wisconsin law, "an affidavit which recites, as a conclusion, that reasonable diligence was exercised is not in itself sufficient" to establish that reasonable diligence has been exercised. *West,* 82 Wis.2d at 167, 262 N.W.2d 87 (citing *Span v. Span,* 52 Wis.2d 786, 191 N.W.2d 209 (1971)). Therefore, because plaintiff has not offered adequate proof that he undertook reasonably diligent efforts to serve defendant Finley, she will be dismissed from this lawsuit.

### B. *Administrative Exhaustion of Title VII Claims*

■ Before a plaintiff may bring a suit in federal court alleging a Title VII violation, he must file a charge with the Equal Employment Opportunity Commission. 42 U.S.C. § 2000e–5. Generally, parties must file their charges within 180 days of the alleged "unlawful employment practice." 42 U.S.C. § 2000e–5(e). However, when an aggrieved employee files first with a state or local agency possessing the authority to address the discrimination, the limitations period is extended to 300 days. *Russell v. Delco Remy Division of General Motors Corp.,* 51 F.3d 746, 750 (7th Cir. 1995). Wisconsin is one of many states that have entered into a work-sharing agreement with the Equal Employment Opportunity Commission in which both the state

and federal agencies treat a complaint filed with one agency as cross-filed with the other and the state agency waives its right to exclusive jurisdiction over the initial processing of a complaint. Under 29 C.F.R. § 1601.74(a) n. 12, filing with the Equal Rights Division extends the time for filing all charges from 180 days to 300 days after the alleged discriminatory act.

The 300–day limitation for filing a Title VII complaint is designed to give prompt notice to an employer of the allegations against it. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 398, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). In its final form, a charge must contain specific information, including the name and address of the person making the charge; the name and address of the respondent; a clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices; the approximate number of employees of the respondent; and a statement disclosing whether proceedings involving the alleged unlawful employment practice have been commenced before a state or local agency charged with the enforcement of fair employment practice laws and, if so, the date of such commencement and the name of the agency. 29 C.F.R. § 1601.12(a). However, failure to include all of these details in an initial charge is not fatal.

> A charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of. A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge

will relate back to the date the charge was first received.

29 C.F.R. § 1601.12(b); *Edelman v. Lynchburg College*, 535 U.S. 106, 110, 122 S.Ct. 1145, 152 L.Ed.2d 188 (2002).

██ "[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel and equitable tolling." *Zipes*, 455 U.S. at 393, 102 S.Ct. 1127. The doctrine of waiver does not apply to this case: defendants insist that plaintiff may not proceed on his Title VII claims because he did not file his complaint with the Equal Rights Division until January 19, 2005, which was more than 300 days after his employment was terminated. Plaintiff concedes that the EEOC served only his January 19, 2005 charge on the Wisconsin Department of Corrections; however, he contends that his December mailing to the EEOC contained his "original" charge and that the January 19 charge was an amended charge prepared by EEOC commissioner Pamela Bloom, with whom plaintiff had consulted regarding the substance of his charge. *See, Id.* at 115, n. 9, 122 S.Ct. 1145 ("The general practice of EEOC staff members is to prepare a formal charge of discrimination for the complainant to review and to verify, once the allegations have been clarified."). Plaintiff asserts that the delay in service of the original charge was the EEOC's error, and consequently, he argues, the time limits imposed by 29 C.F.R. § 1601.74(a) should be tolled from the time the EEOC received his "original" charge in early December until late January 2005, when the EEOC served the "amended" charge on defendants.

To support his allegation, plaintiff has submitted three documents: (1) a registered mail return receipt from the United States Post Office showing that the EEOC

received a mailing from him on December 2, 2004; (2) a letter from EEOC Investigator Pamela Bloomer dated January 7, 2005; and (3) an EEOC form titled "Decision Not to File or to Drop Charges" dated by Bloom on January 7, 2005, and dated by plaintiff on January 19, 2005. Salas Aff., dkt. # 31, Exh. Q, R, V. Conspicuously absent from the submission is a copy of the "original" charge plaintiff allegedly submitted.

When a charge is received by the EEOC, the agency has a duty to serve the charge on the respondent within ten days. 42 U.S.C. § 2000e–5(b). In this case, the EEOC did not serve any charge on defendant until January 19, 2005. There are two plausible explanations for its failure to do so. First, the contents of plaintiff's December 2004 mailing may not have constituted a charge, even under the generous standards of 29 C.F.R. § 1601.12(b). If this was the case, then plaintiff's failure to submit the necessary information to EEOC until six days *after* the time limit for filing a charge would render his January 19, 2005 complaint untimely.

■ A second possibility is that the EEOC's failure to serve the "original" charge was an inadvertent oversight. If the EEOC misled plaintiff into believing that his complaint had been served when in fact it had not, the doctrine of equitable tolling could be applied to prevent plaintiff from suffering adverse consequences from the agency's mistake. *E.g., Early v. Bankers Life and Casualty Co.,* 959 F.2d 75, 81 (7th Cir.1992) ("Misleading conduct by the EEOC can be a basis for tolling the administrative statute of limitations."). Therefore, it was incumbent on plaintiff to show that the fault lay with the EEOC and not with him.

It is undisputed that plaintiff mailed *something* to the EEOC in December 2004. But what did he send? Documents? A letter? Did he name defendants?

What, if any, allegations did he make? Because plaintiff did not submit a copy of the mailing in conjunction with his summary judgment responses, there is no way to know the answer to these questions.

Plaintiff contends that several elements of EEOC investigator Bloom's January 7 letter are sufficient to establish that his December mailing constituted an original charge. First, the January 7 letter refers to "Charge No. 260–2005–01740." Plaintiff contends that this reference establishes that a prior charge existed, which was assigned the same number as his later January 19 charge. However, because the form enclosed with Bloom's letter bore the number 260–2005–01740, it is equally likely that the charge number referred to the enclosure plaintiff had not yet signed, rather than to a document he had submitted previously.

Next, plaintiff points to the portion of Bloom's letter that states, "The date of signature on the charge will not affect the jurisdiction date established in any original written complaint previously given to the EEOC." Salas Aff., dkt. # 31, exh. Q, at 1. He contends that the sentence would be meaningless unless he had submitted an "original written complaint" at an earlier time. What plaintiff overlooks is the fact that Bloom's correspondence was a form letter. The letter makes no specific reference to any earlier written complaint the EEOC may have received from plaintiff. The letter indicates only that it was being sent in response to a "recent inquiry" in the form of "an office visit, phone call, *or* correspondence." *Id.* (Emphasis added.) Furthermore, in bold type, the letter warns that plaintiff should complete the enclosed charge form "as soon as possible" and that the charge must be received by the EEOC "within 300 days of the last date of violation ... in order for it to be timely." *Id.*

The document titled "Decision Not to File or to Drop Issues" provides no support for plaintiff's position. On that form, plaintiff checked a box indicating his wish "to drop from his charge" the contention that defendant had discriminated against him because of his race. Salas Aff., dkt. # 31, exh. R. He contends that he could not drop an issue from his charge unless he had filed such a charge previously. Again, plaintiff overlooks the fact that the form he signed contained the statement (in all capital letters), "I understand that if I decide to file a charge i[n] this matter, I must do so within 300 days of the date of the alleged discrimination." *Id.*

At best, the statements to which plaintiff points raise questions regarding whether his December mailing to the EEOC contained a "written statement sufficiently precise to identify the parties, and to describe generally the action or practices [of which plaintiff] complained." 29 C.F.R. § 1601.12(b). Plaintiff bore the burden of showing that his charge to the EEOC was filed timely. By not submitting a copy of the document he mailed to the EEOC in December, plaintiff made it impossible for the court to determine that his December mailing to the EEOC constituted a timely-filed charge. *Patterson v. General Motors Corp.*, 631 F.2d 476, 485–486 (7th Cir.1980) (plaintiff's failure to support averment with copy of allegedly timely charge supports grant of summary judgment in favor of defendant). Therefore, defendants' motion for summary judgment must be granted with respect to each of plaintiff's Title VII claims.

### C. *Claims Under 42 U.S.C. § 1983*

Plaintiff contends that defendants violated his constitutional rights by (1) conducting "sham" disciplinary hearings regarding his alleged work rule violations; (2) sanctioning him more harshly than similarly situated non-Hispanic employees; and (3) retaliating against him because of his willingness to testify to the EEOC on behalf of a co-worker and because of his criticism of the manner in which the Department of Corrections handled the investigation of his co-worker's discrimination charge.

In an order dated April 17, 2006, I dismissed plaintiff's Title VII discrimination and retaliation claims against defendants Raemisch, Grosshans, Symdon, Finley and Moberly because Title VII does not authorize suits filed against supervisors in their individual capacities. *Williams v. Banning*, 72 F.3d 552, 553–554 (7th Cir. 1995). However, plaintiff's discrimination and retaliation claims against these defendants remain cognizable under 42 U.S.C. § 1983 to the extent that the conduct in which each defendant engaged is alleged to have violated plaintiff's constitutional rights.

■ For a defendant to be liable under § 1983, he or she must have participated directly in a violation of the plaintiff's constitutional rights. *Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1036 (7th Cir.2003). "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir.1996). With respect to supervisors,

> an official satisfies the personal responsibility requirement of section 1983 if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent. That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye. In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery.

*Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir.1995).

Section 1983's "personal participation" requirement extends to state agencies. Unless an agency can be shown to have participated directly in the violation of a plaintiff's constitutional rights, through the promulgation of a policy, or in some other formal fashion, the agency is not subject to suit under § 1983. *Witte v. Wisconsin Dept. of Corrections,* 434 F.3d 1031, 1036 (7th Cir.2006); *Schluga v. City of Milwaukee,* 101 F.3d 60, 63 (7th Cir. 1996). A state agency may not be held vicariously liable for the constitutional violations of its employees. *Id.* (citing *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

Plaintiff has not stated a claim under § 1983 against defendant Wisconsin Department of Corrections because he has not alleged that any formal departmental policy violated his constitutional rights. Plaintiff contends that defendants Raemisch, Grosshans, Symdon and Moberly applied reasonable policies to him in an unreasonable manner by misstating the amount of contact he was required to have with offender Hageman and by blaming him for falsifying forms that were generated automatically by the department's less-than-reliable offender tracking software.

Although defendants Raemisch, Grosshans, Symdon and Moberly might be held liable in their individual capacities for the violations plaintiff alleges, the department may not be held liable on their account. Therefore, defendants' motion for summary judgment will be granted with respect to plaintiff's § 1983 claims against defendant Wisconsin Department of Corrections.

1. *Due process*

Plaintiff contends that defendants Raemisch, Grosshans, Symdon and Moberly violated his Fourteenth Amendment procedural due process rights when they conducted "sham" hearings before firing him. The Fourteenth Amendment prohibits a state from depriving "any person of life, liberty or property, without due process of law." U.S. Const. Amend. XIV. In order to receive protection under the Fourteenth Amendment, a person must have a protected liberty or property interest. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Averhart v. Tutsie,* 618 F.2d 479, 480 (7th Cir.1980). Property interests are not created by the Constitution, but are created and defined by independent sources, "such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth,* 408 U.S. at 577, 92 S.Ct. 2701.

An employee who may be dismissed only for "just cause" has a property interest in his continued employment that is protected by the due process clause of the federal constitution, *Arneson v. Jezwinski,* 225 Wis.2d 371, 393, 592 N.W.2d 606, 616 (1999). Such an employee is entitled to the "full panoply of due-process protections, the minimum requirements of which include a timely and adequate notice of the reasons for the discharge, an impartial decisionmaker, and the opportunity to confront and cross examine adverse witnesses." *Milwaukee Dist. Council 48 v. Milwaukee County,* 2001 WI 65, ¶ 51, 244 Wis.2d 333, 627 N.W.2d 866 (2001).

Under the terms of the contract between plaintiff's union and the Department of Corrections, plaintiff could be fired only for just cause; therefore, he was entitled to due process in connection with his termination. Plaintiff concedes that he was given notice and the opportunity to attend three pre-disciplinary hearings. However, he contends that the hearings were "a sham" because the hearing offi-

cers ignored the evidence he presented, misapplied the applicable work rules and procedures to his supervision of Hageman and failed to provide him with a copy of the form he was alleged to have falsified.

■■■ No matter how complete the panoply of procedural devices which protect a particular liberty or property interest, due process requires that the procedures be applied neutrally. *Ciechon v. City of Chicago*, 686 F.2d 511, 517 (7th Cir.1982). The vindictive or malicious application of otherwise legitimate procedures may deny a particular individual the due process to which he is entitled. *Id.*; *see also Levenstein v. Salafsky*, 164 F.3d 345, 352 (7th Cir.1998) ("fundamentally biased process is not due process").

■■■ "Due process requires that, prior to termination, an employee be given the chance to tell h[is] side of the story, and that the agency be willing to listen." *Ryan v. Illinois Dept. of Children and Family Services*, 185 F.3d 751, 762 (7th Cir.1999). That is not to say that each decision maker must commence a termination hearing with no opinion regarding the likely outcome of the hearing. Indeed, "it would be surprising if [an] employee were brought up on charges warranting termination" if decision makers did not hold the tentative belief that the employee should be removed. *Id.* However, for a hearing to have any meaning at all, decision makers must be open to the possibility that the employee did not commit the violations with which he was charged. *Id.*

As proof that decision makers were not interested in hearing his side of the story, plaintiff points to defendant Moberly's blaming him for failing to supervise Hageman from August 17, 2001 to September 23, 2003, even after he allegedly reminded her that he had not been assigned to supervise Hageman until October 7, 2001, and defendant Symdon's refusal to show him a copy of the form he had allegedly falsified during his final pre-disciplinary hearing. Furthermore, plaintiff contends that defendants misapplied work rules to him in a manner that contradicted the policy and practice of agents in the Madison office.

■■■ In the context of employee disciplinary proceedings, due process does not guarantee unbridled access to all potentially relevant documents. *Swank v. Smart*, 898 F.2d 1247, 1254–55 (7th Cir.1990) (due process in employee discharge cases does not includes right to prehearing discovery). When defendant Symdon asked plaintiff to show her the file information he had used to complete the allegedly falsified form 506, her question was largely rhetorical; because the file contained almost no documentation, her point was that it would have been impossible for plaintiff to have completed the form without first interviewing the client. Although plaintiff did not have Hageman's form 506 in front of him at the hearing, he did have Hageman's file. Plaintiff was free to point to any documents within that file that contained the type of information found on form 506 or to take the position he has taken in this court, namely, that the form was generated automatically by the department's computer system and that he played no role in its completion.

■■■ A hearing is not a "sham" because it results in an unfavorable outcome for a plaintiff. *Pugel v. Board of Trustees of the University of Illinois*, 378 F.3d 659, 666 (7th Cir.2004) ("Due process did not entitle [the plaintiff] to a favorable result based on [her] testimony, only to a meaningful opportunity to present it."). The substance of plaintiff's arguments is that he was not guilty of the work rule infractions for which he was terminated. He does not deny that he was allowed to attend each of his three pre-disciplinary hearings with his union representative. He does not assert

that he was not given a chance to explain his perspective or that defendants failed to conduct additional investigation or that his version of events was omitted from the hearing reports. (Although plaintiff objects to defendant Moberly's misstatement of the dates during which he was responsible for supervising Hageman, it is undisputed that Finley's report contained the correct dates.) Rather, plaintiff objects to defendants' decision to find him guilty and to terminate his employment. That the result was not to his liking does not mean that the process was inadequate.

■■■ Summary judgment is the moment in a lawsuit when a party must show what evidence he has that would convince a trier of fact to accept his version of events. *Schacht v. Wisconsin Dept. of Corrections,* 175 F.3d 497, 504 (7th Cir. 1999). To defeat defendants' motion for summary judgment, plaintiff was required to come forward with facts "sufficient to establish the existence of [each] element essential to [his] case" and on which he would bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Because plaintiff has not adduced evidence from which a jury could find that his disciplinary hearings were "shams," defendant's motion will be granted with respect to plaintiff's due process claim.

2. *Equal protection*

■■■ The equal protection clause grants all citizens "the right to be free from invidious discrimination in statutory classifications and other governmental activity." *Harris v. McRae,* 448 U.S. 297, 322, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). To state a *prima facie* case under the equal protection clause, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) is otherwise similarly situated to members of the unprotected class; (3) he suffered an adverse employ-

ment action; (4) he was treated differently from members of the unprotected class; and (5) the defendant acted with discriminatory intent. *McPhaul v. Board of Commissioners of Madison County,* 226 F.3d 558, 564 (7th Cir.2000); *Greer v. Amesqua,* 212 F.3d 358, 370 (7th Cir.2000). There is no question that plaintiff's termination constituted an adverse employment action. However, defendants contend that plaintiff has not shown that he is a member of a protected class, that he was treated differently from similarly situated employees, or that defendants terminated him because he is Hispanic.

Plaintiff contends that the Department of Corrections disciplines minority employees at a higher rate and more harshly than white employees. As proof of this assertion, plaintiff offered (1) the report of a study conducted by labor union officials; (2) statements purportedly made by former Division of Community Corrections Administrator Cheryll Maples; and (3) disciplinary records of Wisconsin Department of Corrections probation and parole officers alleged to have violated work rules similar to those allegedly violated by plaintiff.

■■■ Neither the study report nor Maples's statements are admissible. First, plaintiff did not lay a foundation for the admissibility of the labor union report. He did not explain the source of the data upon which the report relied, the methodology used to conduct the study or the qualifications of the individuals who produced the study, neither of whom has been named as an expert in this case. Moreover, Maples's purported statements are hearsay, supported only by the affidavits of individuals who aver that they heard Maples make the comments they attribute to her. Plaintiff has not offered Maples's own affidavit or deposition testimony, and the Department of Corrections (of whom

she was an agent at the time the comments were allegedly made) is not a proper defendant to plaintiff's equal protection claim. Therefore, the statements are not admissible as party admissions under Fed. R.Evid. 801(d)(2)(A).

 The employee records plaintiff has introduced are admissible. However, although they appear to show that other probation and parole agents accused of violating similar work rules were disciplined with written reprimands or short-term suspensions instead of termination, the records provide no support for plaintiff's contention that he was disciplined more harshly because he is Hispanic. The disciplinary records plaintiff has introduced do not identify the race, color or national origin of agents Sorenson, Larson, Schachtschneider, Dunn–Jones, Chiarello, Farness or McCoshen. Without information showing that those employees were not Hispanic, the fact that they received less stringent punishments than plaintiff would not permit a jury to infer that plaintiff's national origin had anything to do with his termination.

 Moreover, the Court of Appeals for the Seventh Circuit has emphasized repeatedly that a plaintiff seeking relief under the equal protection clause must produce evidence that the defendants who took adverse action against him did so with a "nefarious discriminatory *purpose.*" *Nabozny v. Podlesny,* 92 F.3d 446, 453 (7th Cir.1996) (emphasis added). This is because

> [t]he gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action. A plaintiff must demonstrate intentional or purposeful discrimination to show an equal protection violation. Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies

that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group.

*Id.* at 453–54 (citing *Shango v. Jurich,* 681 F.2d 1091, 1104 (7th Cir.1982)). It is not enough to show that defendants were negligent in conducting their investigation of plaintiff's alleged work rule violations or in deciding to terminate plaintiff's employment when other workers (even other non-Hispanic workers) had received less stringent punishment. To prevail on his equal protection claim, plaintiff must show that the defendants acted either intentionally or with deliberate indifference. *Id.* at 454.

 Plaintiff has introduced no evidence, either direct or circumstantial, regarding defendant's discriminatory purpose. Because he has not shown that he was treated differently from other similarly situated, non-Hispanic workers and that defendants discriminated against him intentionally because of his national origin, defendants' motion for summary judgment will be granted with respect to plaintiff's equal protection claim.

3. *Retaliation*

 Plaintiff contends that defendants terminated his employment in retaliation for (1) his participation as a witness in the EEOC's investigation of Darren Rogers's complaint and (2) his complaints to Rees regarding the manner in which the Department of Corrections was investigating Rogers's complaint. Although plaintiff contends that his retaliation claim arises under both the First and Fourteenth Amendments, it is well established that the equal protection clause of the Fourteenth Amendment does not include a right to be free from retaliation. *Grossbaum v. Indianapolis–Marion County Bldg. Authority,* 100 F.3d 1287, 1296 (7th Cir.1996);

*Ratliff v. DeKalb County, Ga.,* 62 F.3d 338, 341 (11th Cir.1995); *Nestor Colon Medina & Sucesores, Inc. v. Custodio,* 964 F.2d 32, 43–45 (1st Cir.1992). It is the First Amendment that guarantees freedom of speech and protects government employees from termination because of their speech on matters of public concern. *Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr,* 518 U.S. 668, 675–676, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996).

To prevail on a retaliation claim under the First Amendment, an employee must prove that the conduct in which he engaged was constitutionally protected and was a substantial or motivating factor in his termination. *Id.* To be constitutionally protected, an employee's speech must address a matter of public concern. *Connick v. Myers,* 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In other words, the speech must relate to a matter of community concern, rather than to a particular employee's grievance. *Brooks v. University of Wisconsin Board of Regents,* 406 F.3d 476, 479 (7th Cir. 2005); *McElroy v. Lopac,* 403 F.3d 855, 858 (7th Cir.2005). "When a court finds that an employee's speech touches on a matter of public concern, it must then balance the employee's interest in expression against the employer's interest in promoting effective and efficient public service." *Connick,* 461 U.S. at 142, 103 S.Ct. 1684 (citing *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).

In this case, plaintiff contends that he engaged in two forms of protected speech: his testimony to the EEOC on behalf of his co-worker, Darren Rogers, and his complaint to Rees regarding the manner in which the department was handling the investigation of Rogers's complaint. Testimony regarding illegal discriminatory practices by a state employer relates to a matter of public concern. *Id.* at 146, 103 S.Ct. 1684 (citing *Givhan v. Western Line Consolidated Sch. Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)) (teacher's statements concerning school district's alleged policy of racial discrimination involved matter of public concern); *Catletti ex rel. estate of Catletti v. Rampe,* 334 F.3d 225, 231 (2d Cir.2003) (worker's testimony on behalf of wrongly discharged co-workers was protected speech). Furthermore, defendants have not identified any way in which plaintiff's testimony to the EEOC or complaints to Rees might have interfered with the department's interest in promoting effective and efficient public service. Therefore, I conclude that plaintiff's testimony to the EEOC was entitled to First Amendment protection.

Whether plaintiff's complaints to Rees constitute a "matter of public concern" is a more difficult question. In his email exchange with Rees, plaintiff wrote that he "felt" the interview site she had designated was not "a neutral site for [him]." Rees Aff, dkt. # 18, Ex. D. This statement was clearly personal. However, plaintiff went on to ask Rees to pick a site "that would be central for everyone coming in," where "people c[ould] go without feeling pressured." *Id.* Assuming that plaintiff's comments to Rees qualify for First Amendment protection, the dispositive question is whether plaintiff's speech, either to the EEOC or to Rees, was a substantial and motivating factor in his termination.

Plaintiff insists that he has raised a "triable issue of fact" by merely asserting that he was notified of his termination several weeks before his scheduled EEOC interview. As plaintiff notes, it is settled in this circuit that a plaintiff may establish a causal link between protected expression and adverse action through evidence that the discharge took place on the

heels of protected activity. *Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir.1998). Circumstantial evidence may be enough to support an inference of retaliation in the absence of facts to the contrary; however, in this case it is undisputed that defendants were unaware of the role plaintiff planned to play in the EEOC investigation of Rogers's complaint. Although plaintiff contends that defendants received notice of Rogers's complaint against them on December 4, 2003, he has adduced no evidence that the charge served upon defendants contained any reference to plaintiff or that defendants knew from any other source that plaintiff planned to testify to the EEOC on Rogers's behalf. Defendants Raemisch and Moberly did not know that plaintiff was connected in any way to the EEOC's investigation of Rogers's complaint. Defendants Symdon and Grosshans knew that the EEOC wanted to interview plaintiff (along with seven other employees), but there is no evidence that they knew that plaintiff intended to corroborate Rogers's complaints against the department.

 Moreover, the undisputed facts reveal that when Rees relayed plaintiff's concerns regarding the manner in which the department handled its investigation of Rogers's complaint, she did so to the EEOC investigator only. Defendants were wholly unaware of plaintiff's concerns regarding the site picked for the EEOC interview and with the number of people who received the email concerning the EEOC's proposed interviewees. Finally, and of greatest importance, it is undisputed that plaintiff's termination was approved *before* the EEOC contacted the department to set up an interview with plaintiff and other employees regarding Rogers's complaint.

Because plaintiff has adduced no evidence from which a jury could infer that his protected speech was a substantial and motivating factor in his termination, defendants' motion for summary judgment will be granted with respect to his retaliation claim.

## ORDER

IT IS ORDERED that defendants' motion for summary judgment is GRANTED. The clerk of court is directed to enter judgment in favor of defendant and close this case.